1   Ronald L.M. Goldman, Esq. (State Bar #33422)
    *rgoldman@baumhedlundlaw.com*
2   Clay Robbins, III, Esq. (State Bar #101275)
    *crobbins@baumhedlundlaw.com*
3   BAUM HEDLUND ARISTEI & GOLDMAN, P.C.
    10940 Wilshire Boulevard, 17th Floor
4   Los Angeles, California 90024
    Telephone: (310) 207-3233
5   Facsimile: (310) 820-7444

6   *Attorneys for Plaintiffs Cynthia A. Coler, as*
    *Personal Representative and Administrator*
7   *of the Estate of Cassandra J. Webb, and on*
    *behalf of Caleb J. Webb and Dustin M. Webb,*
8   *the Sole Surviving Heirs of Decedent, Cassandra J. Webb*

9                  **UNITED STATES DISTRICT COURT**
                   **CENTRAL DISTRICT OF CALIFORNIA**
10                        **WESTERN DIVISION**

11   CYNTHIA A. COLER, as Personal          CASE NO.:
     Representative and Administrator of
12   the Estate of Cassandra J. Webb,       **PLAINTIFFS' WRONGFUL DEATH**
     and on behalf of CALEB J. WEBB         **AND SURVIVAL ACTION**
13   and DUSTIN M. WEBB, the Sole           **COMPLAINT FOR DAMAGES AND**
     Surviving Heirs of Decedent,           **DEMAND FOR JURY TRIAL**
14   Cassandra J. Webb

15                  Plaintiffs,
              vs.
16
17   PRINCESS CRUISE LINES, LTD,
     doing business as PRINCESS
18   CRUISES; VENTURE TRAVEL,
     LLC, doing business as TAQUAN
     AIR; and MOUNTAIN AIR
19   SERVICE, LLC,

20                  Defendants.

---

COMPLAINT - 1

1    PLAINTIFFS CYNTHIA A. COLER, as Personal Representative and

2  Administrator of the Estate of Cassandra J. Webb, and on behalf of CALEB J.

3  WEBB and DUSTIN M. WEBB, the sole surviving heirs of decedent, Cassandra J.

4  Webb ("PLAINTIFFS' decedent"), by and through their attorneys, file their

5  Complaint asserting survival and wrongful death claims against defendants

6  PRINCESS CRUISE LINES, LTD., doing business as PRINCESS CRUISES

7  (collectively referred to as "PCL"); VENTURE TRAVEL, LLC, doing business as

8  TAQUAN AIR; and MOUNTAIN AIR SERVICE, LLC, doing business as

9  MOUNTAIN AIR, and allege as follows:

10  **<u>INTRODUCTION</u>**

11    1.    On May 13, 2019 PLAINTIFFS' decedent was a fare-paying

12  passenger on Defendant PCL's cruise ship, the *Royal Princess.*

13    2.    Prior to the cruise embarking from Vancouver, Canada on May 11,

14  2019 Defendant PCL, amongst other things, marketed, promoted, advertised and

15  sold various shore excursions to the passengers of the *Royal Princess,* specifically

16  including a tour known as the Misty Fjords Wilderness Cruise and Flight Tour (the

17  "Misty Fjords Tour") which Defendant PCL sold to PLAINTIFFS' decedent. The

18  Misty Fjords Tour consisted of a boat ride from the Ketchikan Harbor Seaplane

19  Base located in Ketchikan, Alaska to the Misty Fjords National Monument, and

20  then the return trip back to the seaplane base was by an aircraft equipped with floats

that that took off from, and was intended to land in, water.  All aspects of the Misty Fjords Tour, including all travel arrangements, coordination, and the selection of the operators who would conduct the boat and aircraft portions of the tour were controlled, selected, vetted and determined by Defendant PCL on behalf of PLAINTIFFS' decedent.

3.    Defendant PCL derives substantial revenues from shore excursions that it markets, promotes, advertises and sells to its cruise passengers, specifically including the Misty Fjords Tour that Defendant PCL sold to PLAINTIFFS' decedent. The Misty Fjords Tour, and other tours consisting of seaplane scenic flights, are also used by PCL to market and sell its cruise packages, of which it also derives substantial revenues.

4.    At all times relevant herein, and as a result of the promotional and advertising materials provided by Defendant PCL, PLAINTIFFS' decedent reasonably and justifiably believed that the Misty Fjords Tour, including the operator of the flight portion, was safe because it was selected, vetted, offered, coordinated, managed, conducted, controlled, owned, co-owned and/or operated by Defendant PCL.

5.    On May 13, 2019 PLAINTIFFS' decedent disembarked the *Royal Princess* at the port in Ketchikan, Alaska*,* for the Misty Fjords Tour that it purchased through Defendant PCL.  At all times relevant, Defendant PCL handled

all arrangements for the tour, and its agents, servants, employees and/or representatives directed PLAINTIFFS' decedent from the *Royal Princess* to the boat for the commencement of the Misty Fjords Tour.  The boat ride was uneventful.

6.     The flight portion of the Misty Fjords Tour was to consist of an approximate 25-minute flight that was to take off and land in water to return PLAINTIFFS' decedent from the Misty Fjords National Monument to the Ketchikan Harbor Seaplane Base located at the port in Ketchikan, Alaska, where it was intended that PLAINTIFFS' decedent was to, at the direction of Defendant PCL's agents, servants, employees and/or representatives, re-embark the *Royal Princess* for her cruise to the next port of call.  During this flight, the aircraft, which was selected by the Defendant PCL was involved in a mid-air collision, causing the aircraft to rapidly descend more than 3,350 feet and crash into the icy waters of the George Inlet.  As a result of the mid-air collision and subsequent crash, PLAINTIFFS' decedent suffered severe and serious personal, physical, mental and emotional injuries, and ultimately was killed by drowning.


## **PARTIES**

7.     Cassandra J. Webb died by drowning in the above-referenced accident on May 13, 2019. The Estate of Cassandra J. Webb was opened on June 21, 2019,

and is pending in the State of Missouri, County of St. Louis, Case No. 19SL-PR01945. At the time of her death, PLAINTIFFS' decedent was a citizen of the State of Missouri. The Estate of Cassandra J. Webb was opened on June 21, 2019. CYNTHIA A. COLER (the decedent's sister) was appointed Personal Representative and Administrator of the Estate of Cassandra J. Webb on July 23, 2019. PLAINTIFFS CALEB J. WEBB and DUSTIN M. WEBB were and are the surviving sons and sole surviving heirs of Cassandra J. Webb, deceased. PLAINTIFFS CALEB J. WEBB and DUSTIN M. WEBB are citizens of St. Louis County, Missouri.

8.     At all times relevant, Defendant PCL was and is a for profit corporation duly organized and existing under the laws of Bermuda, maintaining its principal place of business in the state of California.  In addition, Defendant PCL unilaterally and without negotiation issues a passage contract as part of its cruise ticket which purports to bind all passengers who travel on its cruise ships, specifically including the PLAINTIFFS (the "Passage Contract").  The Passage Contract contains non-negotiable terms, including forum selection and choice of law clauses as further detailed below. PLAINTIFFS's decedent also complied with all purported notice provisions contained in the Passage Contract.

9.     At all times relevant, Defendant VENTURE TRAVEL LLC, doing business as TAQUAN AIR (referred to as "TAQUAN AIR"), was and is a for profit

limited liability company duly organized and existing under the laws of the state of Alaska, maintaining its principal place of business in the state of Alaska.  Upon information and belief, the members of TAQUAN AIR are also citizens of the state of Alaska.

10.    At all times relevant, Defendant TAQUAN AIR leased and operated a certain De Havilland DHC-3 "Turbine Otter" model aircraft, bearing Federal Aviation Registration Number N959PA (referred to as the "Taquan Otter Aircraft") that was involved in the mid-air collision that is the subject of this litigation.

11.    At all times relevant, Defendant MOUNTAIN AIR SERVICE, LLC ("MOUNTAIN AIR"), was and is a for-profit limited liability company duly organized and existing under the laws of the state of Alaska, maintaining its principal place of business in the state of Alaska.  Upon information and belief, the members of MOUNTAIN AIR are also citizens of the state of Alaska.

12.    Defendant MOUNTAIN AIR owned and operated the other aircraft that was involved in the mid-air collision, namely, a De Havilland DHC-2 "Beaver" model aircraft, bearing Federal Aviation Registration Number N952DB (referred to as the "Mountain Air Beaver Aircraft").

## JURISDICTION AND VENUE

13.    This matter arises under General Maritime Law and any other applicable supplemental law, as the claims and damages herein occurred over and

on navigable waterways of the United States, during traditional maritime activity, and/or as provided in the Passage Contract.  This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, 28 U.S.C. §1331. It is being brought pursuant to Article III, §2 of the United States Constitution, delegating jurisdiction over admiralty cases to the federal courts, and 28 U.S.C. §1333.

14. This action is being brought in this Court, as opposed to state court as allowed by the Saving to Suitors Clause under 28 U.S.C. § 1333, due to the fact that Defendant PCL unilaterally and without negotiation includes a forum selection clause in its Passage Contract, which provides, amongst other things, that all claims involving personal injury, emotional harm, illness or death shall be litigated in and before the United States District Court for the Central District of California in Los Angeles.  Notwithstanding that suit has been filed in this forum, PLAINTIFFS reserve their right to contest the validity of this or any other clause contained in the Passage Contract.

15. Subject Matter Jurisdiction also exists pursuant to 28 U.S.C. § 1332, diversity of citizenship, and the amount in controversy exceeds $75,000.00.

16. In addition, Defendant PCL maintains its corporate headquarters in this State and as such, is subject to the general jurisdiction of this Court.

17.    Upon information and belief, Defendants TAQUAN AIR and/or MOUNTAIN AIR are each subject to the specific personal jurisdiction of this Court as a result of operating, conducting, engaging and/or carrying on a business venture in the state of California, and specifically within this judicial district; and/or were engaged in substantial activity within this state; and/or solicited, or actually entered into contracts in this state; all of which was and is directly related to the claims that are the subject of this litigation, namely the flight services that they each provided to the cruise ship passengers of Defendant PCL, and/or as an agent of the Defendant PCL, in connection with the flight portion of the Misty Fjords Tour which resulted in the death of PLAINTIFFS' decedent and the loss, damages and injuries alleged herein.

18.    Section 1 of the Passage Contract between Princess and PLAINTIFFS' decedent states that all disputes between these parties is governed by general maritime law, and if not, California law. This contract also states that affiliated companies, independent contractors, shore excursion providers and tour operators, are "third party beneficiaries [who] derive rights and exemptions from liability as a result of this Passage Contract." (Sec. 1) It further provides that such third parties are considered the "Carrier" for the purposes of contractual rights, exemptions from liability, defenses and Immunities. Section 1 states in relevant part:

Specifically, all of Carrier's rights, exemptions from liability, defenses and immunities under this Passage Contract (including, but not limited to, those described in Sections 4, 6, 7, 12, 13, 14, and 15) will also inure to the benefit of the following persons and entities who shall be considered "Carrier" only for purposes of such rights, exemptions from liability, defenses and immunities: . . . . any affiliated or related companies thereof and their officers, crew, pilots, agents or employees, and all concessionaires, independent contractors, . . .  shore excursion providers, tour operators, . . . .

19.   Section 15 of the Passage Contract sets forth jurisdiction and venue.

(B) Forum and Jurisdiction for Legal Action:

(i) <u>Claims for Injury, Illness or Death</u>: All claims or disputes involving Emotional Harm, bodily injury, illness to or death of any Guest whatsoever, including without limitation those arising out of or relating to this Passage Contract or Your Cruise [including off-ship excursions], shall be litigated in and before the United States District Courts for the Central District of California in Los Angeles, or as to those lawsuits over which the Federal Courts of the United States lack subject matter jurisdiction, before a court located in Los Angeles County, California, U.S.A., to the exclusion of the courts of any other country, state, city, municipality, county or locale. You

1  consent to jurisdiction and waive any objection that may be available to

2  any such action being brought in such courts.

3        20.    Defendant PCL states on its website that it acts as an "agent" for its

4  excursion operators, one of whom is Defendant TAQUAN AIR.  As agent and/or

5  joint venturer, Defendant PCL had authority to bind Defendant TAQUAN AIR to

6  the Passage Contract and the forum selection clause. In addition, the acts of

7  Defendant PCL in California as agent of Defendant TAQUAN AIR constitute the

8  acts of Defendant TAQUAN AIR in California for personal jurisdiction

9  considerations.  Defendants TAQUAN AIR and PCL are agents of each other.

10 Furthermore, as a result of its business relationship with Defendant PCL,

11 Defendant TAQUAN AIR was aware of the provisions of the Passage Contract

12 and did not object to the foregoing jurisdictional conditions of the Passage

13 Contract.  As such, Defendant TAQUAN AIR is estopped from asserting a lack of

14 personal jurisdiction in this Court.

15       21.    By its own terms, and/or on the basis of estoppel, the conditions of the

16 Passage Contract, including the forum selection clause, apply to Defendant

17 TAQUAN AIR as an excursion operator.

18       22.    Defendant TAQUAN AIR has also engaged in substantial and not

19 isolated activity in California directly related to the causes of action set forth in this

20 Complaint. Defendant TAQUAN AIR's continuous and systematic activities in

California, including agreeing to California jurisdiction by way of its tour operator agreement as discussed below, also include:

      a.    Contacting cruise lines in California, specifically including the Defendant PCL, for the purposes of establishing long term business partnerships with cruise lines, specifically including Defendant PCL, to conduct sightseeing flights in Alaska, including the flight portion of the Misty Fjords Tour;

      b.    Providing scenic flights to passengers of Defendant PCL in scheduled ports-of-call where said defendant's vessels' call, including in Ketchikan, Alaska, where thousands of Defendant PCL's passengers are brought. The best way that Defendant TAQUAN AIR can attract these customers is by contacting California-based Defendant PCL and establishing a principal/agent relationship as well as other business relationships with Defendant PCL to provide flight services, including the flight portion of the Misty Fjords Tour, that directly results in the creation of contractual relationships between Defendant TAQUAN AIR, Defendant PCL, and Princess passengers, specifically including the PLAINTIFFS, in Los Angeles, California;

      c.    Partnering with major cruise operators like Defendant PCL which results in lucrative business income for Defendant TAQUAN AIR, as the

vast majority of participants in Defendant TAQUAN AIR's flight excursions come from its partnership with cruise lines, specifically including Defendant PCL. By entering into an agreement with California-based Defendant PCL in California, Defendant TAQUAN AIR derives and receives the benefits of the cruise line's advertising efforts originating in Los Angeles County, California and directed toward their actual and potential customers, specifically including PLAINTIFFS' decedent, and specifically with respect to flight operations including the flight portion of the Misty Fjords Tour;

    d.   Before and after a passenger boards a vessel, Defendant PCL offers, arranges for, recommends and markets excursions operated by Defendant TAQUAN AIR, specifically including the flight portion of the Misty Fjords Tour. For instance, Defendant PCL advertises and promotes the Misty Fjords Tour which ostensibly includes Defendant TAQUAN AIR's flights as it is the operator of the flight portion of the Misty Fjords Tour.  These websites, hosted in California, specifically target millions of North American cruise passengers. Defendant PCL allows passengers to book and pay for excursions through Princess' website, specifically including the Misty Fjords Tour, from "180 days before travel, and up to 5 days before they depart."  Through the website, passengers of the Defendant PCL can purchase the tour, read about the tour, see pictures, watch a

1   promotional video, and review all of the excursion items that Defendant PCL

2   will offer upon their arrival at the port of call. All of these promotional and

3   booking activities originate and are consummated in Los Angeles County,

4   California;

5          e.     Defendant PCL also allows passengers to book and purchase

6   shore excursions, including the Misty Fjords Tour, which includes flight

7   operations conducted by the Defendant TAQUAN AIR, at designated PCL

8   excursion and exploration desks on board its ships. At these desks,

9   passengers can talk to a PCL crewmember, who is trained by PCL to answer

10  questions and provide information about excursions, specifically including

11  the Misty Fjords Tour, and to help passengers purchase such a tour which

12  includes the flight portion operated by Defendant TAQUAN AIR, yet these

13  PCL crewmembers do not disclose to passengers the name of the operator

14  who will conduct the flight portion of the Misty Fjords Tour;

15         f.     The tickets for the Misty Fjord Tour are marketed, advertised,

16  and sold through Defendant PCL in Los Angeles County, California, and

17  tickets for the flight excursions, including the Misty Fjords Tour purchased

18  by PLAINTIFFS' decedent, were issued from Defendant PCL in California;

19         g.     Defendant PCL maintains a department and/or a specific group

20  of employees at its headquarters in California devoted to reviewing,

investigating, vetting, approving, creating, developing, promoting, marketing, coordinating, explaining, overseeing, supervising, auditing, tracking and monitoring the excursions sold to its passengers, and its ports of call, specifically including the Misty Fjords Tour which includes the flight portion operated by the Defendant TAQUAN AIR. Defendant PCL solely issues the tickets for such excursions, including the tickets of PLAINTIFFS' decedent on the subject excursion which included the flight portion operated by Defendant TAQUAN AIR;

h.   After a passenger books an excursion on the Defendant PCL's website or aboard one of its ships, the Defendant TAQUAN AIR conducts the flight portion of the Misty Fjords Tour and then forwards an invoice to Defendant PCL's accounts payable department in California. These invoices are then processed and approved by the accounts payable department in California, which then transfers funds to Defendant TAQUAN AIR based on banking details provided by Defendant TAQUAN AIR to Defendant PCL;

i.   Upon information and belief, in order to maintain existing (and obtain new) business, Defendant TAQUAN AIR submits annual bids and/or renewals for contracts to Defendant PCL's headquarters in California. Through these bids and/or renewals, Defendant TAQUAN AIR offers and

permits Defendant PCL the right to sell to PCL's customers, via PCL's California website, tickets on the excursions which includes flights operated by the Defendant TAQUAN AIR in Alaska. The bids include forms (created by Defendant PCL in California) which are generally referred to as tour proposal templates. In the template, Defendant TAQUAN AIR provides Defendant PCL information regarding each excursion flight including tour operator information, tour pricing, timing, accessibility, safety policies, licenses, permits and prior accidents and injuries that have occurred;

j.     TAQUAN AIR submits these bids and the attached tour templates every year to Defendant PCL in California in order to renew existing agreements and to sell its flight excursions through Defendant PCL in Los Angeles County, California. Defendant PCL then processes Defendant TAQUAN AIR's bid and determines (at its California offices), whether or not to renew and/or expand its existing agreement with Defendant TAQUAN AIR. By submitting bids, renewals, and tour proposal templates to California-based cruise lines every year, Defendant TAQUAN AIR purposefully and systematically contacted cruise lines in California to maintain (and increase) its revenues and to sell, in Los Angeles County, California, tickets on its excursion flights;

k.     Upon information and belief, at all times material, Defendant

TAQUAN AIR has entered into one or more written contracts with Defendant PCL entitled "Tour Operator Manual and Agreement" and/or has entered into a business enterprise and/or course of dealing with Defendant PCL (collectively referred to herein as "tour operator agreement") to co-venture the marketing, selling, and provision of recreational shore excursions, including flights such as those purchased by Plaintiff's decedent, for the benefit of Defendant PCL's cruise passengers. The tour operator agreement provides that its purpose is to enhance "passengers' experiences" and ensure "passengers' safety". PLAINTIFF's decedent was a third-party beneficiary of the operator/excursion provider agreements between Defendants PCL and TAQUAN AIR. PLAINTIFFS do not have a copy of this agreement(s), and therefore cannot fully plead facts from the same. Counsel for Defendants PCL and TAQUAN AIR agreed to produce the tour operator agreement before this Complaint was filed, but they have since refused to do so;

l.      Upon information and belief, the tour operator agreement further contains California forum and choice of law provisions, which governs claims arising between Defendants PCL and TAQUAN AIR, and between Defendants PCL and/or TAQUAN AIR and passengers/excursion users, such as PLAINTIFFS' decedent. Though PLAINTIFFS are without a copy

of this agreement, upon information and belief, at least part of the California forum clause in Defendant PCL's written agreements with other tour operators, states:

> Tour Operators **agree to submit to personal jurisdiction in Los Angeles County, California** by providing shore excursions or related services to Princess Cruise Lines, Ltd. and Carnival plc passengers. Tour Operators **waive any and all objections** they may have to jurisdiction or venue in Los Angeles County, California. Liability coverage must respond to claims brought in the United States based on an incident arising from one of the Tour Operator's programs or related services (emphasis added).

m.   Upon information and belief, in the tour operator agreement(s), Defendant TAQUAN AIR agreed to a "California" forum selection clause providing that lawsuits with Defendant PCL's customers shall be brought in this District. In addition, upon information and belief, Defendant TAQUAN AIR agreed to indemnify Defendant PCL for some or all of the claims made in this Complaint;

n.   Upon information and belief, the tour operator agreement was drafted by Defendant PCL's legal department in California. Upon

1   information and belief, the contract became fully executed, after Defendant

2   PCL signed it in California. PLAINTIFFS' decedent was and so

3   PLAINTIFFS are third-party beneficiaries of all such agreements between

4   Defendants PCL and TAQUAN AIR;

5          o.   Through the passage contract, Defendant TAQUAN AIR's

6   acceptance of it and/or express or implied incorporation of it in agreements

7   with Defendant PCL, Defendant TAQUAN AIR agreed to the forum

8   selection clauses' exclusive jurisdiction of the courts in California for all

9   disputes and matters between Defendant PCL's passengers and Defendant

10  TAQUAN AIR, including the claims brought by PLAINTIFFS herein.

11         p.   In addition, through the tour operator agreement, Defendant

12  TAQUAN AIR agreed to the exclusive jurisdiction of the courts in California

13  for all disputes and matters related to excursions involving Defendant PCL's

14  passengers, including claims arising from the May 13, 2019, mid-air

15  collision during the Misty Fjords Tour.

16  23.    By agreeing to the jurisdiction of the court in California, Defendant

17  TAQUAN AIR purposefully availed itself in advance, and intended to submit itself

18  to the jurisdiction of this court and/or Defendant TAQUAN AIR is subject to the

19  jurisdiction of this court by engaging in substantial and purposeful in this State

20  which are directly related to the claims in this litigation;

24.     Upon information and belief, and at all times relevant, Defendant MOUNTAIN AIR engaged in substantial and not isolated activity in California which is directly related to the claims in this litigation.  Defendant MOUNTAIN AIR's continuous and systematic activities within California include contracting with, and/or soliciting to contract with, and in maintaining an ongoing business relationship and/or partnership with Defendant PCL in California which enabled Defendant MOUNTAIN AIR to provide flight services which resulted in the losses, damages and injuries claimed by PLAINTIFFS herein.

25.     Upon information and belief, by entering into the contractual relationship with Defendant PCL, and/or soliciting to enter into said arrangement, Defendant MOUNTAIN AIR derived substantial revenues from PCL's passengers, and benefitted from this relationship in California all as a result of Defendant MOUNTAIN AIR's solicitation of business in this State regarding the performance of flight services which are directly related to the claims set forth herein.

26.     Upon information and belief, the contractual arrangement and/or solicitation of the contractual arrangement between Defendants MOUNTAIN AIR and PCL was drafted and/or occurred in the state of California, and the contract could only become effective after the Defendant PCL executed the contract in California.

27.     In addition, Defendant MOUNTAIN AIR conducted substantial business in this state which is directly related to the claims in this litigation, namely, that at least one passenger on the Mountain Air Beaver Aircraft at the time of the mid-air collision was a citizen and resident of the state of California, who, upon information and belief, purchased his ticket while in the state of California, and as such, Defendant MOUNTAIN AIR was engaged in substantial activity within this state, advertised, solicited business and/or entered into contracts in this state.  As a result, Defendant MOUNTAIN AIR specifically and purposefully solicited business, derived substantial revenues, from and within the state of California that are directly related to the claims asserted in this litigation, namely the flight services that it offered that led to the mid-air collision and the death of PLAINTIFFS' decedent and availed itself of the benefits and privileges of doing business in the State of California.

28.     Based upon the foregoing, Defendant MOUNTAIN AIR is subject to the personal jurisdiction of this Court.

29.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant PCL is a corporation with its principal place of business in Los Angeles, California.   Additionally, Defendant PCL unilaterally and without negotiation inserts a forum selection clause into the Passage Contract purporting to require that litigation be filed in this Court.   Upon information and belief,

1   Defendants TAQUAN AIR and/or MOUNTAIN AIR have conducted business in

2   this district, including either entering into agreements with the Defendant PCL or

3   soliciting to enter into such agreements in this district with Defendant PCL's

4   passengers to provide flight services in connection with tour excursions either on

5   their own and/or those that Defendant PCL marketed, promoted, advertised and

6   sold to its cruise passengers, and/or solicited business within this judicial district.

7   **GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS**

8        30.    PLAINTIFFS repeat, reiterate and re-allege all allegations contained

9   in paragraphs 1 through 29 as though fully set forth at length herein.

10        31.    Defendant PCL engaged in the for-profit business of providing to the

11   public generally, and PLAINTIFFS' decedent in particular, vacation cruises aboard

12   its vessels, including the *Royal Princess.* Defendant PCL is a common carrier and

13   direct claims of negligence by PLAINTIFFS herein fall within the prohibitions

14   against disclaimers as contained in 46 U.S.C. §30509. That statue prohibits

15   common carriers from limiting their liability for "personal injury or death caused

16   by negligence or fault of the owner [of the passenger vessel] or the owner's

17   employees or agents." *Id*. 30509(a)(1)(A).

18        32.    Seaplane scenic flights to the Misty Fjords National Monument is the

19   top cruise ship excursion in Alaska and is the highlight of many passenger trips.

20   This excursion is used by Defendant PCL to sell Alaska cruise trips to its

1  customers. Therefore, it is financially critical that Defendant PCL be able to offer

2  this excursion to sell its Alaskan cruises.

3      33.    In early 2016, before the Alaskan cruise ship season, Defendant

4  TAQUAN AIR and Promech Air ("Promech") were the sole aviation providers for

5  Defendant PCL (and other Carnival cruise operators) of the scenic seaplane flights

6  to Misty Fjords National Monument, each performing approximately one-half of

7  the flights for Defendant PCL. As a result of numerous prior accidents (set forth

8  below), including the June 24, 2015 fatal accident that killed 9 people on a Promech

9  Otter aircraft, Promech was unable to continue its operations due to safety related

10 issues. As a result, Defendant PCL was left with no operator to operate

11 approximately half of its planned Misty Fjords National Monument scenic seaplane

12 flights for the 2016 season, possibly losing substantial revenue on this excursion,

13 and reduced passengers overall, due to the unavailability of this excursion. In April,

14 2016 Defendant TAQUAN AIR purchased Promech in its entirety, including hiring

15 Promech's employees, and the purchase allowed Defendant TAQUAN AIR to

16 immediately operate a fleet of Turbine Otter Aircraft as a "turnkey" operation.

17 Notwithstanding the significant safety issues at Promech. Defendant PCL failed to

18 perform an adequate safety review, or any safety review, of Defendant TAQUAN

19 AIR after its purchase of Promech, including the manner in which Defendant

20 TAQUAN AIR incorporated Promech assets into its flight operations.

34.     Starting in 2016, Defendant TAQUAN AIR was the sole aviation provider for Defendant PCL (and other Carnival cruises) of the scenic seaplane flights to Misty Fjords National Monument. After the July 10, 2018 Taquan Air Otter accident, caused by pilot error and company mismanagement, Defendant PCL was put on further notice that Defendant TAQUAN AIR was incompetent and unfit to safely fly Defendant PCL passengers. However, Defendant PCL had no other operator in Ketchikan to perform these flights. Therefore, because of the financial significance of offering this excursion as part of its Alaskan cruises, Defendant PCL chose to continue allowing Defendant TAQUAN AIR to operate flights when it knew, and should have known, that Defendant TAQUAN AIR was unfit and not safe, placing Defendant PCL passengers, including PLAINTIFFS' decedent, at an unreasonable risk of harm, and without warning.

35.     As part of the cruise that it offered to PLAINTIFFS' decedent, Defendant PCL, through written literature as well as through its California-based, privately maintained website specifically directed at PLAINTIFFS' decedent, actively and purposefully marketed, promoted, advertised and sold various shore excursions to the passengers of the *Royal Princess,* specifically including the Misty Fjords Tour that was sold to PLAINTIFFS' decedent.

36.     All promotional materials regarding tour excursions that Defendant PCL offered for sale, specifically including the Misty Fjords Tour, created the

impression that the tour was a "PCL tour" by, amongst other things, prominently displaying Defendant PCL's logo and stating in sum and substance that these were "unique" and "exclusive" PCL tour excursions; referred to the tour excursions as "our" tour excursions for which "exceptional service" is provided; as well as other representations and depictions that demonstrated and/or created the impression that Defendant PCL promoted, selected, vetted, offered, coordinated, managed, conducted, operated, controlled, owned and/or co-owned the tour excursions, specifically including the Misty Fjords Tour.

37.    The promotional materials written, published and/or promulgated by Defendant PCL also recommended to PCL's passengers, specifically including PLAINTIFFS' decedent, that they purchase their tour excursions exclusively through Defendant PCL for a variety of reasons, including, but not limited to, "a best price guarantee"; "small groups"; "guaranteed return to ship"; and "a promise that the ship will wait"; all in a further effort to recommend and "push" these tour excursions on Defendant PCL's passengers, as well as creating the impression, upon which PLAINTIFFS' decedent specifically relied, that the tour excursions offered for sale by Defendant PCL, including the Misty Fjords Tour, were selected, vetted, offered, coordinated, managed, conducted, operated, controlled, owned and/or co-owned by the Defendant PCL; and/or that Defendant PCL properly and carefully screened and audited the entities that provided the actual tour; and/or that

Defendant PCL co-ventured, co-owned and/or worked in conjunction with the tour operators in a joint venture or common enterprise, and/or in partnership; as well as that the tour excursions, including the Misty Fjords Tour, were in fact safe for Defendant PCL's passengers, specifically including PLAINTIFFS' decedent; all of which representations PLAINTIFFS' decedent relied upon.

38.     Furthermore, upon initially embarking the *Royal Princess* prior to the start of the cruise, Defendant PCL's agents, servants, employees and/or representatives directed passengers, specifically including PLAINTIFFS' decedent, to the "tour excursions desk" where Defendant PCL further marketed, promoted, advertised and sold various tour excursions, specifically including the Misty Fjords Tour, again creating the impression that the tour excursions were selected, vetted, offered, coordinated, managed, conducted, controlled, owned, co-owned and/or operated by the Defendant PCL, all for the benefit of PCL's passengers, including, but not limited to, for their safety and security.

39.     At no time prior to PLAINTIFFS' decedent embarking upon the Misty Fjords Tour did Defendant PCL disclose the name of the operator of the flight portion of the excursion, nor did Defendant PCL provide a means for PLAINTIFFS' decedent to identify the operator, furthering the justifiable expectation and belief on the part of PLAINTIFFS' decedent that the Misty Fjords

Tour was selected, vetted, offered, coordinated, managed, conducted, controlled, owned, co-owned and/or operated by the Defendant PCL.

40.    At all times relevant, Defendant PCL made all arrangements with respect to the Misty Fjords Tour on behalf of PLAINTIFFS' decedent; all contacts by or on behalf of PLAINTIFF'S decedent regarding the Misty Fjords Tour were with Defendant PCL; PLAINTIFFS' decedent was charged by, invoiced and paid Defendant PCL for the Misty Fjords Tour; and PLAINTIFFS' decedent received her receipt for her purchase of the tour exclusively from Defendant PCL, all without Defendant PCL ever identifying the operator of the flight portion of the Misty Fjords Tour.

41.    As a result of the material representations by, and obligations of, the Defendant PCL, including, but not limited to, with respect Defendant PCL's paper and on-line marketing, promotion, advertising and sale of the Misty Fjords Tour, which were specifically and justifiably relied upon by PLAINTIFFS' decedent, PLAINTIFFS' decedent purchased the Misty Fjords Tour with the expectation that the tour was selected, vetted, offered, coordinated, managed, conducted, controlled, owned, co-owned and/or operated by the Defendant PCL, all for the benefit of Defendant PCL's passengers, including, but not limited to, for their safety and security.

42.    Furthermore, at all times relevant, Defendants TAQUAN AIR and/or MOUNTAIN AIR were the agents and/or apparent agents of the Defendant PCL with respect to the Misty Fjords Tour such that Defendant PCL is estopped from denying that Defendants TAQUAN AIR and/or MOUNTAIN AIR were its agents.

43.    At all material times herein, Defendant TAQUAN AIR was the agent, apparent agent, joint venturer, servant, and/or employee of Defendant PCL and at all times acted within the course and scope of that employment, agency, apparent agency, joint venture or service by virtue of the following, among other facts:

a.    Defendant PCL made all arrangements for the subject excursion without disclosing to PLAINTIFFS' decedent that the subject excursion flight was to be performed by Defendant TAQUAN AIR;

b.    Defendant PCL marketed the subject excursion using its company logo on its website and/or in its brochures and/or on its ship without disclosing to PLAINTIFFS' decedent that the subject excursion was operated by Defendant TAQUAN AIR;

c.    Defendant PCL maintained a department and/or specific group of employees in its headquarters in California devoted to creating, developing, promoting, marketing, coordinating, controlling, explaining, overseeing, supervising, auditing, tracking and monitoring its ports of call and the

1  excursions sold to its passengers, including the subject scenic flight

2  excursion.

3       d.    Defendant PCL maintained an excursion desk on its ship, staffed

4  by its employees, where Defendant PCL marketed, offered and sold

5  excursions, provided expert advice and information, answered questions,

6  handled and resolved complaints and refunds on behalf of its subsidiary,

7  employees, servants, agents, representative, and/or tour operator partners,

8  including Defendant TAQUAN AIR, for which Defendant PCL incurred

9  certain expenses and costs and reaped significant profit;

10       e.    Defendant PCL recommended its passengers to not engage in

11  excursions, tours and/or activities that are not Princess excursions sold

12  through Defendant PCL;

13       f.    The exclusive contract and contact held by PLAINTIFFS'

14  decedent concerning this excursion was with Defendant PCL;

15       g.    Defendant PCL determined the amount of money charged for the

16  subject excursion;

17       h.    The fee for the Misty Fjords Tour, including the scenic flight

18  portion, was charged to PLAINTIFFS' decedent and collected from

19  PLAINTIFFS' decedent, exclusively by Defendant PCL, and Defendant

20  PCL handled all the funds paid by PLAINTIFFS' decedent;

1      i.    PLAINTIFFS' decedent received a receipt from Defendant PCL

2      for the purchase of the subject excursion, including tickets;

3      j.    Defendant PCL determined the time, length, and scheduling of

4      each excursion;

5      l.    Defendant PCL controlled the operation of the excursion by

6      promulgating various rules and regulations governing the conduct of the

7      excursion, the equipment to be utilized and the personnel allowed to conduct

8      the excursion, which it required its subsidiaries, employees, servants, agents,

9      representative, and/or tour operator partners, including Defendant TAQUAN

10     AIR, to follow as part of its agreement with Defendant PCL;

11     m.    Defendant PCL controlled and/or maintained the right of control

12     over the excursion by supervising and monitoring its performance and

13     retaining the right to require its subsidiaries, employees, servants, agents,

14     representative, and/or tour operator partner Defendant TAQUAN AIR, to

15     modify, alter or change the manner in which each excursion was conducted,

16     the equipment utilized and/or the personnel conducting such excursion;

17     n.    Defendant PCL controlled the operation of the excursion by

18     expressly reserving the right to determine when each excursion was safe to

19     operate under the conditions existing at the time, including the right to

20     modify, terminate or abort each excursion at any time when it was necessary

to do so for the safety of its passengers, or for other reasons determined by Defendant PCL;

     o.    Defendant PCL represented to its passengers, including PLAINTIFFS' decedent, that the excursions which it sold to them were safe, operated by reliable personnel using safe equipment, and operated subject to the safety requirements established by Defendant PCL;

44.    At all times material, Defendant TAQUAN AIR was an agent, ostensible/apparent agent, employee, joint venturer, and/or representative of Defendant PCL. Any representations to the public by Defendant PCL to the contrary do not control the legal status of the parties.

45.    At all times material hereto, Defendant PCL was responsible for, and liable for, the actions of Defendant TAQUAN AIR with respect to the subject excursion. In the alternative, at all times material hereto, a partnership and/or joint venture existed between Defendant TAQUAN AIR and Defendant PCL, whereby Defendant PCL and Defendant TAQUAN AIR are jointly and severally responsible for the negligence of each other as partners of the partnership and/or joint venture:

     a.    Defendant PCL and Defendant TAQUAN AIR entered into an agreement whereby Defendant PCL made all arrangements for PLAINTIFFS' decedent, on behalf of its partnership and/or joint venture

1    with Defendant TAQUAN AIR, for PLAINTIFFS' decedent to participate

2    in the subject excursion;

3        b.    Defendant PCL advertised and marketed the excursion on its

4    website, in its literature and aboard its vessels, on behalf of its relationship

5    with Defendant TAQUAN AIR, for which Defendant PCL incurred certain

6    expenses and costs;

7        c.    Defendant PCL maintained, on behalf of its relationship with

8    Defendant TAQUAN AIR, a department and/or a specific group of

9    employees in its headquarters in California devoted to creating, developing,

10   promoting, marketing, coordinating, explaining, overseeing, supervising,

11   auditing, tracking and monitoring its ports of call and the excursions sold to

12   its passengers, including the excursion on which PLAINTIFFS' decedent

13   was killed;

14       d.    Defendant PCL maintained an excursion desk on its ships,

15   including the *Royal Princess*, staffed by its employees, from which it

16   marketed, offered and sold excursions, provided expert advice and

17   information, answered questions, handled and resolved complaints and

18   refunds, on behalf of its subsidiaries, employees, servants, agents,

19   representative, and/or tour operator partners, including Defendant TAQUAN

20   AIR for which Defendant PCL incurred certain expenses and costs;

e. Defendant TAQUAN AIR provided the DHC-3 aircraft N959PA and pilot for the Misty Fjords Tour;

f. Defendant PCL paid Defendant TAQUAN AIR a portion of the sales of tickets for scenic flight excursions, after excursion tickets were sold, specifically that portion of the revenue received from PLAINTIFFS' decedent;

g. Defendant PCL shared profits and losses with Defendant TAQUAN AIR for the scenic flight excursions—including the subject excursion, which were divided among them the according to the agreements between Defendant PCL and Defendant TAQUAN AIR;

46. In addition, Defendant PCL had an obligation to ensure the safety of its passengers on shore excursions, including the Misty Fjords Tour, by properly selecting, vetting, screening, auditing and/or retaining the entity that was to provide services during shore excursions, specifically including the flight portion of the Misty Fjords Tour, especially with respect to flight operations to ensure that such services were safe, appropriate and competently operated.

47. Defendant PCL advertised and promoted to PLAINTIFFS' decedent that it regularly monitored the business activities of its excursion operators, such as Defendant TAQUAN AIR, and investigated the operators for safety. Defendant

PCL was responsible for all details regarding the flight portion of the Misty Fjords Tour, and that it (Defendant PCL) was offering the tour excursion.

48.     On its website, Defendant PCL represented:

> We selected only the most reputable companies available to provide your excursions. The companies providing your excursions are selected by Princess based on their excellent reputation for service and safety.

49.     At all times relevant, Defendant PCL selected Defendant TAQUAN AIR to conduct the flight portion of the Misty Fjords Tour, and expressly and/or implied represented the safety of these flights to its cruise ship passengers, including PLAINTIFFS' decedent, and PLAINTIFFS' decedent relied on, to her detriment, Defendant PCL's marketing, promotion, advertising, sale, vetting, review, investigation, endorsement, approval, and/or selection of Defendant TAQUAN AIR to conduct the flight portion of the tour.

50.     Defendant PCL is part of the global cruise family of companies owned and/or operated by Carnival Corporation & Defendant PLC, which also includes: Carnival Cruise Line, Holland America Line, Princess Cruises, Seabourn, P&O Cruises UK, Cunard, AIDA Cruises, Costa Cruises, P&O Cruises (Australia), Fathom, and HAP (Alaska/Yukon). As a result, information and notice to Carnival Corporation & Defendant PLC and these other companies, constitutes notice to

Princess with regard to accidents and safety involving Alaskan cruise operations and excursions, including Ketchikan port flight excursions to and from the Misty Fjords National Monument.

51.    Given Defendant PCL's obligations as set forth herein, Defendant PCL, knew, or should have known, prior to May 13, 2019, the significant unsafe operating history of the Defendant TAQUAN AIR, including but not limited to, the fact that Defendant TAQUAN AIR (and/or its acquired company) had been involved in at least 13 separate aircraft accidents since 1994, which included 5 fatal accidents that resulted in the deaths of 17 people. These accidents also caused 24 serious injuries. Most of the accidents occurred near Ketchikan during cruise ship passenger scenic flight operations, and nearly all of the accidents involved pilot error and/or safety lapses at Defendant TAQUAN AIR, in the same or similar type of aircraft that were involved in the subject mid-air collision as set forth below:

52.    Before May 13, 2019, Defendant PCL knew or should have known of the aircraft accident history involving Defendant TAQUAN AIR, including but not limited the following:

a.    **Overall Accident History.** Defendant TAQUAN AIR had been involved in at least 13 aircraft accidents since 1994, 5 of which resulted in 17 fatalities. These accidents also caused 24 serious injuries. Most of the accidents occurred near Ketchikan during cruise ship passenger scenic flight

operations, and nearly all of the accidents involved pilot error and/or safety lapses at Defendant TAQUAN AIR, in the same type of aircraft that were involved in the subject accident.

b.   **July 10, 2018 Accident**. A Taquan Air DHC-3 Otter crashed into mountain in bad weather en route to Ketchikan. There were 11 persons on board, and 6 were seriously injured. The accident was caused by pilot error, company mismanagement, and failure to follow safety procedures. As a result of this accident, and due to safety concerns with Defendant TAQUAN AIR, Defendant PCL suspended its TAQUAN AIR flightseeing tours, but the suspension was short-lived, and TAQUAN AIR flights on behalf of Defendant PCL's passengers resumed.

c.   **April 11, 2016 Taquan buys Promech**. Defendant TAQUAN AIR purchased its Ketchikan competitor, Promech, and merged Promech into its operations. This purchase included Promech's aircraft, operations, facilities, FAA certificates, contracts, and employees. The purchase nearly doubled Defendant TAQUAN AIR's fleet size to 16 aircraft and added the De Havilland Turbine Otter Aircraft fleet to Defendant TAQUAN AIR's operations, including aircraft N959PA, which was involved in the mid-air collision. Prior to this purchase, Defendant TAQUAN AIR did not operate any Turbine Otter Aircraft. Also included in the purchase was Promech's

Part 135 operating certificate covering Promech's (now TAQUAN AIR's) Otter aircraft, which also included Otter pilot training, Otter aircraft operating checklists, and Otter approved maintenance program. In addition, all employees at Promech were offered an equivalent or similar job at TAQUAN AIR, and nearly all of Promech's employees accepted this offer. Defendant TAQUAN AIR took over Promech's contracts with the cruise ship industry, including contracts with Defendant PCL for Misty Fjords Flightseeing and the flight portion of the Misty Fjords Tour. Defendant PCL was aware of the acquisition of Promech by Defendant TAQUAN AIR (including its operation and employees), was aware of the operating and accident history of both Defendant TAQUAN AIR and Promech in 2016 and before, and continued to contract with Defendant TAQUAN AIR to fly Defendant PCL cruise ship passengers, despite this accident history, and without further review or investigation.

   d.   **June 25, 2015 Accident.** A Promech DHC-3 Otter collided with mountainous terrain 24 miles east of Ketchikan.  All nine persons died. The flight was a scenic flight for cruise ship passengers. The aircraft was en route to Ketchikan from Rudyerd Bay, 44 miles to the east. The accident was caused by pilot error and a company culture which tacitly endorsed flying in

hazardous weather. The company also failed to manage risks and did not have a formal safety program.

**e.     July 24, 2013 Accident.** A Promech DHC-2 Beaver sustained an in-flight engine failure which caused the pilot to crash into trees. Three persons were injured.

**f.     2012 Accident.** A Taquan Air DHC-2 Beaver tipped on its side during a water taxi before takeoff. The cause of the accident was pilot error: the pilot's failure to maintain directional control during a step turn on floats.

**g.     July 24, 2007 Accident.** A Taquan Air DHC-2 Beaver was on an air tour flight from Ketchikan to Misty Fjords National Monument when the pilot flew into a mountain in bad visibility. This accident was caused by pilot error. All five persons on board were killed.

**h.     July 28, 2005 Accident**. A Promech DHC-3 Otter was conducting a local sightseeing flight when a fire broke out which required an emergency landing five miles southeast of Ketchikan. The fire was the result of a fuel line leak caused by electrical arc. Also contributing to the accident was an inadequate annual inspection by company maintenance personnel. One person was seriously injured.

**i.     August 19, 2002 Accident – Mid-Air Collision.** Promech was operating two seaplanes, a DHC-3 Otter and a DHC-2 Beaver. Both departed

Ketchikan seaplane base on cruise ship passenger scenic flights, and both were loaded with passengers. While en route to Misty Fjords National Monument, the two aircraft had a mid-air collision. Both aircraft were damaged but made emergency landings. The cause of the accident was pilot error, i.e. the pilot's failure to maintain an adequate visual outlook during cruise climb, which resulted in a midair collision between the two airplanes. This mid-air collision involved the same types of aircraft that were involved in the May 13, 2019, collision, namely a DHC-3 Otter and a DHC-2 Beaver.

**j.      June 19, 2002 Accident.** One Promech seaplane hit another Promech seaplane while on the water at the Ketchikan dock. The accident was caused by a dockhand prematurely letting go of a rope, and the operator's failure to provide adequate safe zones for the airplanes.

**k.      August 5, 1998 Accident.** A Taquan Air Cessna 185 seaplane had an engine failure in flight due to fuel mismanagement by the pilot, which caused the aircraft to crash into terrain. The flightseeing flight had departed Rudyerd Bay and was en route to Ketchikan. One passenger died, and the pilot and other passenger received serious injuries. This accident was caused by pilot error.

**l.      September 29, 1997 Accident.** A Promech DHC-2 Beaver seaplane stalled during takeoff from Ketchikan and crashed into the water.

The pilot, who was the only person on board, died. The accident was caused by pilot error: the pilot's excessive climb and turning maneuver at low altitude, the pilot's inadvertent stall, and the intentional operation of the airplane with the required stall warning system was disabled.

**m.   December 12, 1996 Accident.** A Taquan Air DHC-2 Beaver on floats encountered gusty wind conditions and crashed on water 18 miles southwest of Ketchikan. The injured passenger escaped the sinking aircraft, but the pilot was unable to escape and died. The cause of the accident was pilot error: inadequate compensation for wind conditions and failure to maintain adequate airspeed leading to the stall.

**n.   January 2, 1995 Accident.** A Taquan Air Cessna 208 on floats struck a partially submerged log during a high speed water taxi operation. The cause of the accident was pilot error, in that he selected an unsuitable landing area. There were no injuries to the eight persons on board.

**o.   June 8, 1994 Accident.** A Taquan Air Cessna 185 seaplane dragged a wing in the water during landing. There were no injuries, but the aircraft was substantially damaged.  The cause of the accident was pilot error, involving the pilot's inadequate compensation for wind.

**p.   May 20, 2019 Accident** A Taquan Air DHC-2 seaplane crashed during a water landing at Metlakatla, Alaska killing the pilot and passenger.

Although this crash is still under investigation, preliminary reports indicated the cause of the crash as pilot error and that the pilot only had 5 hours total time flying seaplanes. While this crash occurred one week after the subject accident, it is further proof of Defendant TAQUAN AIR's continued unsafe operation and the deficient safety culture that existed at the time of the subject mid-air collision.

53.     Defendant PCL was either aware of all of these accidents, and/or should have been aware of them because they are matters of public record, and Defendant PCL had a duty to vet, screen, review, investigate, endorse and approve both Defendant TAQUAN AIR and Promech to fly Defendant PCL scenic flight excursions. This accident history reflects a dangerous company culture lacking formal safety programs.

54.     As a result of the significant accident history at Defendant TAQUAN AIR (individually and/or through the company it acquired), including a prior mid-air collision and multiple crashes caused by pilot error, Defendant PCL knew, or should have known, that Defendant TAQUAN AIR was incapable, incompetent, and unfit, to provide the Defendant PCL's passengers, specifically including PLAINTIFFS' decedent, with the highest level of safety and that given this significant deficient safety record, the continued use of Defendant TAQUAN AIR to conduct the flight portion of the Misty Fjords Tour by the Defendant PCL was

1    "an accident waiting to happen" and thus, Defendant PCL should not have

2    selected/and or retained Defendant TAQUAN AIR to conduct the flight portion of

3    the Misty Fjords Tour.

4         55.   Because of its safety record and accident history, Defendant TAQUAN

5    AIR should not have been an approved excursion flight operator of Defendant PCL,

6    and Defendant PCL should not have held out the Misty Fjords flights to its

7    passengers and public as being safe and approved by Defendant PCL including for

8    the subject excursion on May 13, 2019. Defendant TAQUAN AIR's accident

9    history established that it was not a safe operator, that pilot error was the common

10   cause of nearly all of the previous accidents, including a nearly identical mid-air

11   accident in 2002 that involved two Promech aircraft.

12        56.   Defendant PCL failed to disclose these accidents, the accident history

13   of Defendant TAQUAN AIR, and the risks involved to its cruise ship passengers,

14   specifically including PLAINTIFFS' decedent. Had this accident history been

15   disclosed and PLAINTIFFS' decedent been warned of the danger of flying with

16   Defendant TAQUAN AIR, PLAINTIFFS' decedent would not have taken the May

17   13, 2019 flight.

18        57.   In addition and at all times relevant, and specifically on behalf of

19   PLAINTIFFS' decedent, Defendant PCL contracted with, and/or chartered with,

20   Defendant TAQUAN AIR to provide the flight service portion associated with the

Misty Fjords Tour, and as such, Defendant PCL acted as an air charter broker and/or indirect air carrier as those terms are defined by the Federal Aviation Regulations, including 14 CFR part 295. Defendant PCL had a statutory duty to disclose the identity of Defendant TAQUAN AIR to PLAINTIFFS' decedent before or at the time that she purchased her tickets for the excursion, which was breached, denying PLAINTIFFS' decedent the opportunity to know that Defendant TAQUAN AIR was the operator and to discover Defendant TAQUAN AIR'S safety record and accident history.

58. PLAINTIFFS' decedent relied on Princess to screen, vet, investigate, review, and approve its excursion operators, including Defendant TAQUAN AIR. On its website, Defendant PCL represented:

> We selected only the most reputable companies available to provide your excursions. The companies providing your excursions are selected by Princess based on their excellent reputation for service and safety.
>
> https://www.princess.com/learn/faq_answer/pre_cruise/excursions.jsp

59. On and prior to May 13, 2019, Defendant TAQUAN AIR was an airline certificated under 14 C.F.R. Part 135 of the Federal Aviation Regulations

1  and was, and is, a commercial air carrier engaged in the business of carrying

2  passengers for hire.

3    60.    On and prior to May 13, 2019, Defendant TAQUAN AIR entered into

4  the Tour Operating Contract with Defendant PCL whereby it was to operate the

5  Taquan Otter Aircraft as an on-demand sightseeing flight pursuant to said contract,

6  and on behalf of Defendant PCL.

7    61.    On May 13, 2019, and pursuant to the Tour Operating Contract, the

8  Taquan Otter Aircraft was operated as a charter flight intending to carry only

9  Defendant PCL's cruise passengers, specifically including PLAINTIFFS'

10 decedent, from the Misty Fjords National Monument to the Ketchikan Harbor

11 Seaplane Base located at the port in Ketchikan, Alaska.

12   62.    As a Part 135 air carrier, Defendant TAQUAN AIR, either on its own

13 and/or in conjunction with Defendant PCL, provided training, instruction, guidance

14 and/or supervision to the pilot of the Taquan Otter Aircraft, who at all times

15 relevant was acting within the course and scope of his employment, and either on

16 its own and/or in conjunction with Defendant PCL, wrote and/or approved

17 instructions and warnings for the subject aircraft and its component parts and

18 systems, including, but not limited to, its aircraft flight manual, aircraft operating

19 manual, pilot operating handbook, training manuals, curriculum and/or procedures,

20 including, but not limited to, training, procedures and operations regarding flight

1  in congested airspace, especially during the busy tourist season, including, but not

2  limited to, specific training to avoid a mid-air collision.

3      63.   On and prior to May 13, 2019, Defendant MOUNTAIN AIR was an

4  airline certificated under 14 C.F.R. Part 135 of the Federal Aviation Regulations

5  and was, and is, a commercial air carrier engaged in the business of carrying

6  passengers for hire.

7      64.   On May 13, 2019, the Mountain Air Beaver Aircraft was operated as

8  a charter flight by the defendant MOUNTAIN AIR intending to carry passengers

9  of Defendant PCL from the Misty Fjords National Monument to the Ketchikan

10  Harbor Seaplane Base located at the port in Ketchikan, Alaska.

11      65.   As a Part 135 air carrier, Defendant MOUNTAIN AIR provided

12  training, instruction, guidance and/or supervision to the pilot of the Mountain Air

13  Beaver Aircraft who at all times relevant was acting within the course and scope of

14  his employment, and wrote and/or approved instructions and warnings for the

15  subject aircraft and its component parts and systems, including, but not limited to,

16  its aircraft flight manual, aircraft operating manual, pilot operating handbook,

17  training manuals, curriculum and/or procedures, including, but not limited to,

18  training, procedures and operations regarding flight in congested airspace,

19  especially during the busy tourist season, including, but not limited to, specific

20  training to avoid a mid-air collision.

66.   On May 13, 2019, PLAINTIFFS' decedent and others disembarked the *Royal Princess* and were directed by Defendant PCL's agents, servants, employees, and/or representatives to the boat that was going to ferry them to Misty Fjords National Monument as part of the Misty Fjords Tour.  The boat ride was uneventful.

67.   Upon conclusion of the boat ride, PLAINTIFFS' decedent and others boarded the Taquan Otter Aircraft for the flight portion of the Misty Fjords Tour. It was intended that the aircraft would embark from water on an approximately 25-minute sight-seeing flight from the Misty Fjords National Monument to the Ketchikan Harbor Seaplane Base located at the port in Ketchikan, Alaska, where the aircraft was to land on water, and PLAINTIFFS' decedent would then re-embark the *Royal Princess* to continue their vacation cruise.

68.   The Taquan Otter Aircraft N959PA had been purchased by Defendant TAQUAN AIR from Promech in 2016. On May 13, 2019, the aircraft's operating checklist was not a TAQUAN AIR checklist, but was an outdated Promech checklist, entitled "Promech Air Normal Checklist". Though ADS-B use was required on the aircraft, the checklist did not contain any ADS-B checklist items.

69.   The pilot of the Taquan Air N959PA was Lewis Beck. Mr. Beck was an employee and/or servant and/or agent and/or apparent agent of Defendant TAQUAN AIR, and at all relevant times herein was acting within the scope of his

employment and/or agency with Defendant TAQUAN AIR. Defendant TAQUAN AIR is vicariously liable for all of the acts and omissions of Mr. Beck related to the underlying accident. At all times during subject flight Mr. Beck was piloting and navigating N959PA and was the pilot in command in charge of safely operating the subject scenic flight.

70.     On May 13, 2019, at approximately 12:21 Alaska Daylight Time, with PLAINTIFFS' decedent on board as a passenger, the Taquan Otter Aircraft was travelling in the airspace above the George Inlet as the subject aircraft was returning to the Ketchikan Harbor Seaplane Base. Upon information and belief, the Defendant TAQUAN AIR's pilot, Mr. Beck, had not checked his ADS-B collision avoidance equipment since flying over Carroll Inlet to the east. Furthermore, Mr. Beck had not turned on certain avionics equipment, specifically the Taquan Otter Aircraft's GSL71, so that the aircraft's altitude and transponder identification were not transmitted "out" for identification and use by other aircraft using the ADS-B system.

71.     At said time and place, the Mountain Air Beaver Aircraft was also travelling in the airspace above the George Inlet for its flight returning to the Ketchikan Harbor Seaplane Base. Neither aircraft made position reports over the radio as required.

72.    At said time and place, as the respective aircraft were each at an altitude of approximately 3,350 feet mean sea level ("msl"), the aircraft collided over George Inlet, a navigable waterway, causing the Taquan Otter Aircraft to essentially "free fall" into the icy waters of the George Inlet.  The Mountain Air Beaver Aircraft broke apart in mid-air due to the mid-air collision.

73.    The Taquan Otter Aircraft crashed into the freezing cold waters of the George Inlet.  PLAINTIFF' decedent sustained injuries in the mid-air collision and impact with the icy water. She was thereafter unable to free herself from her restraints and, as a result, died by drowning.

74.    After the collision, N959PA rapidly dropped more than 3000 feet, where it slammed onto the water on the west side of George Inlet, and quickly sank. The pilot and passengers were able to get out of the wreckage before it was too late, with the exception of PLAINTIFFS' decedent, who was unable to escape and died in the sinking wreckage.

75.    As a result of the mid-air collision and the drowning of PLAINTIFFS' decedent, PLAINTIFFS herein have suffered loss, damage and/or injury.

### FIRST CAUSE OF ACTION FOR

### NEGLIGENCE AGAINST DEFENDANT PCL

76.    PLAINTIFFS repeat, reiterate and re-allege all allegations contained in paragraphs 1 through 75  as though fully set forth at length herein.

77.     At all material times, Defendant PCL, as common carrier of the cruise and the subject Misty Fjord Tour, owed a duty to their paying passengers, including PLAINTIFFS' decedent, to provide, amongst other things, the utmost and highest duty of care for the health, welfare, and safety of their passengers for the Misty Fjord Tour, specifically including the flight portion of the tour, which was a commercial transportation undertaking. This duty included, amongst other things, the duty to warn.

78.     At all material times, Defendant PCL owed a duty to their passengers, including PLAINTIFFS' decedent, to exercise reasonable care for the health, welfare, and safety of their passengers, including for the Misty Fjord Misty Fjord Tour, specifically including the flight portion of the tour. This duty also included, amongst other things, the duty to warn.

79.     The mid-air collision, crash and death/injury of PLAINTIFFS' decedent, individually and/or collectively, were caused by Defendant PCL's negligence, recklessness and/or carelessness in one or more of the following ways:

a.     the subject flight was operated by Defendant TAQUAN AIR, who at all times was Defendant PCL's agent, joint venturer and/or representative with respect to the Misty Fjords Tour and thus, Defendant PCL is vicariously, directly and/or otherwise liable for the actions and/or omissions of Defendant TAQUAN AIR in causing the mid-air collision, as

set forth herein, including, but not limited to, Defendant TAQUAN AIR's failure to properly operate the subject flight as well as its violations of Federal Aviation Regulations, including failure to see and avoid; failure to properly use available collision-avoidance equipment; failure to report position over the common traffic advisory frequency, as required; failure to follow appropriate flight procedures; failure to yield the right of way; failure to maintain aircraft spacing and separation; and/or operating the aircraft in a careless and/or reckless manner; all for which Defendant PCL is liable;

b.    pursuant to applicable Federal Aviation Regulations and/or applicable law, Defendant PCL was the operator of the subject flight and as such, is responsible for any act and/or omission that occurred during the flight as detailed herein, including, the mid-air collision and the death/injury to PLAINTIFFS' decedent;

c.    Defendant PCL improperly failed to examine Defendant TAQUAN AIR's background, prior operating history and/or safety record, especially in light of said defendant's prior crashes and significant deficient safety record as outlined herein and as reported to Defendant PCL, and inappropriately selected and/or retained Defendant TAQUAN AIR to conduct the flight portion of the Misty Fjords Tour;

d.    Defendant PCL knew, or should have known, that Defendant TAQUAN AIR was unfit and incapable of safely conducting the flight portion of the subject tour, especially in light of the prior history of deadly crashes and/or the significant deficient safety record of Defendant TAQUAN AIR;

e.    Defendant PCL failed to conduct proper and appropriate safety checks, safety reviews, check rides and/or audits of Defendant TAQUAN AIR, and had it done so, Defendant TAQUAN AIR would not have been selected by Defendant PCL to conduct the flight portion of the Misty Fjords Tour;

f.    Defendant PCL failed to properly and/or adequately conduct a risk management analysis with respect to Defendant TAQUAN AIR, and had it done so, Defendant TAQUAN AIR would not have been selected and/or retained by Defendant PCL to conduct the flight portion of the Misty Fjords Tour;

g.    Defendant PCL failed to provide its cruise ship passengers, specifically including PLAINTIFFS' decedent, with the appropriate level of safety and warnings with respect to the Misty Fjords Tour, including, but not limited to, that it sold tickets on an air carrier that had a significantly deficient safety record and fatal accident history;

h.     Defendant PCL marketed, advertised, sold and profited from the Misty Fjords Tour yet failed to provide its cruise ship passengers, specifically including PLAINTIFFS' decedent, with the appropriate level of safety with respect to the subject tour;

i.     Defendant PCL improperly selected and/or contracted with Defendant TAQUAN AIR to conduct the flight portion of the Misty Fjords Tour, especially in light of Defendant TAQUAN AIR's prior operating history and/or significant deficient safety record;

j.     PLAINTIFFS' decedent specifically relied upon Defendant PCL's representations that the Misty Fjords Tour was safe when in fact it was not;

k.     Defendant PCL inappropriately promoted, advertised and sold the Misty Fjords Tour to its' cruise ship passengers, specifically including PLAINTIFFS' decedent, when it knew, or should have known, that the flight portion of the Misty Fjords Tour was not safe, especially in light of Defendant TAQUAN AIR's prior operating history and/or significant deficient safety record;

l.     Defendant PCL's promotional materials and/or advertising with respect to the Misty Fjords Tour was misleading and inappropriate, especially since those materials claimed that Defendant PCL would provide

the "highest quality excursion", despite that it knew, or should have known, that Defendant TAQUAN AIR was incapable of providing passengers with the highest level of safety as required by applicable Federal Aviation Regulations based upon, amongst other things, Defendant TAQUAN AIR's prior operating history and/or significant deficient safety record, and PLAINTIFFS' decedent specifically relied upon these representations made by Defendant PCL;

m.   Defendant PCL inappropriately entered into, and/or renewed, the Tour Operating Contract with Defendant TAQUAN AIR when it knew, or should have known, based on Defendant TAQUAN AIR's prior operating history and/or significant deficient safety record that Defendant TAQUAN AIR was incapable of providing passengers with the highest level of safety as required by applicable Federal Aviation Regulations;

n.   Defendant PCL failed to properly examine Defendant TAQUAN AIR's operating history, and had it done so, Defendant TAQUAN AIR would not have been selected and/or retained by Defendant PCL to conduct the flight portion of the Misty Fjords Tour based upon its prior operating history and/or its significant deficient safety record;

o.   Defendant PCL failed to conduct any pre-flight coordination with Defendant TAQUAN AIR, and had it done so the mid-air collision would

not have occurred, especially due to the route flown by the pilot of the Taquan Otter Aircraft leading to the mid-air collision;

p.   Defendant PCL failed to disclose to PLAINTIFFS' decedent at any time prior to the Misty Fjords Tour that the flight portion was to be operated by Defendant TAQUAN AIR thereby preventing PLAINTIFFS' decedent from conducting her own investigation into Defendant TAQUAN AIR, and had this information been disclosed, as was required, PLAINTIFFS' decedent would not have participated in the Misty Fjords Tour, especially in light of Defendant TAQUAN AIR's prior operating history and/or significant deficient safety record;

q.   Defendant PCL violated applicable Federal Aviation Regulations under Part 295 or otherwise, concerning the subject flight, including required disclosures as well as the chartering of same, and had this information been disclosed, as was required, PLAINTIFFS would not have participated in the Misty Fjords Tour, especially in light of Defendant TAQUAN AIR's prior operating history and/or significant deficient safety record;

r.   Defendant PCL improperly selected and/or improperly chartered Defendant TAQUAN AIR to conduct the flight portion of the Misty Fjords Tour;

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

s.      Defendant PCL failed to provide its passengers with the highest level of safety, including, but not limited to, by failing to ensure that the aircraft it selected to conduct the Misty Fjords Tour was either equipped with specific technology (collision avoidance equipment) designed to, amongst other things, prevent mid-air collisions, and/or failing to ensure that if such equipment was available, that it was operational and that the pilot conducting the tour paid special attention to such equipment, especially in light of the fact that Defendant PCL knew, or should have known, that the flight portion of the subject tour was operated in highly congested visual flight rules airspace;

t.      Defendant PCL improperly and/or inappropriately selected a flight tour operator that did not utilize the services of a dedicated tour guide and/or lookout which forced the pilot of the Taquan Otter Aircraft to simultaneously act as the pilot in command and tour guide thereby preventing him from focusing exclusively on his operational duties, especially since Defendant PCL knew, or should have known, that the flight portion of the tour was conducted in heavily congested visual flight rules airspace, and if Defendant PCL had required that a tour guide and/or lookout be used the mid-air collision would not have occurred;

u.    As a result of the information that Defendant PCL knew, or should have known, as detailed above, the Defendant PCL improperly retained the flight tour operator to conduct the flight portion of the Misty Fjords Tour; and

v.    Defendant PCL was otherwise negligent, reckless and/or careless, including, but not limited to, failing to provide for the safety of its passengers; all of which resulted, in whole or in part, in the mid-air collision that caused injury to and the death of PLAINTIFFS' decedent.

80.    As a result of the accident, PLAINTIFFS' decedent lost her life by drowning, and prior thereto experienced pre-death terror, emotional distress, pain, and suffering. As a result, PLAINTIFFS have sustained loss, damage and/or injury, including a loss of care, comfort, society, services, assistance, protection, affection, love, instruction, guidance, counsel, training and support.

## SECOND CAUSE OF ACTION FOR

## NEGLIGENT MISREPRESENTATION AGAINST DEFENDANT PCL

81.    PLAINTIFFS repeat, reiterate and re-allege all allegations contained in paragraphs 1 through 80 as though fully set forth at length herein.

82.    At all times relevant herein, it was the duty of Defendant PCL to provide PLAINTIFFS' decedent with reasonable care under the circumstances.

83.     At all times relevant, and upon information and belief, Defendant PCL's promotional and informational materials, including written literature and/or its website-based information that was directed to PLAINTIFFS' decedent, which PLAINTIFFS' decedent specifically relied upon, were created, drafted, and/or edited by the Defendant PCL.

84.     Defendant PCL's promotional material, written literature, brochures and/or its website content contained misrepresentations of material facts, including, but not limited to:

a.     misrepresenting that the Misty Fjords Tour was safe when in actuality the tour was not safe and/or appropriate for Defendant PCL's passengers as alleged herein. . Defendant PCL expressed and/or implied that the (undisclosed) operator of the flight portion of the tour had an excellent flight safety history, when that was not the case. Defendant PCL represented that it would provide the highest quality sightseeing flight excursions, which includes the same highest quality standard of safety, which was not correct and was therefore misleading;

b.     misrepresenting and creating the false impression that the Misty Fjords Tour was managed, conducted, operated, controlled, owned and/or co-owned by Defendant PCL;

c.   misrepresenting that the tours offered by Defendant PCL, including the Misty Fjords Tour, were operated by entities that Defendant PCL selected based upon their excellent reputation for safety and security for Defendant PCL's passengers;

d.   Defendant PCL misrepresented that the operator of the flight portion of the Misty Fjords Tour had an "excellent reputation for service and safety". To the contrary, Defendant TAQUAN AIR had been involved in at least 13 aircraft accidents since 1994, of which 5 accidents involved 17 fatalities. These accidents also caused 24 serious injuries. Most of the accidents occurred near Ketchikan during cruise-ship passenger scenic flight operations, and nearly all of the accidents involved pilot error and safety lapses at Defendant TAQUAN AIR, including a culture that permitted taking flight safety risks.  Despite this accident history, Defendant PCL informed the general public, and its own passengers of the following, which is taken from Defendant PCL's website:

> We selected only the most reputable companies available to provide your excursions. The companies providing your excursions are selected by Princess based on their excellent reputation for service and safety.

https://www.princess.com/learn/faq_answer/pre_

cruise/excursions.jsp

e.    misrepresenting and/or implying that the operator of the flight portion of the Misty Fjords Tour maintained adequate insurance to cover loss; and

f.    representing and/or implying that all excursion providers would be subject to personal jurisdiction in the courts of California by unilaterally inserting a forum selection clause requiring that litigation arising from the death of PLAINTIFFS' decedent be commenced in this Court.

85.    The foregoing statements made and/or disseminated by Defendant PCL were known, or through the exercise of reasonable care should have been known, to be false and/or misleading, through and including the following:

a.    Defendant PCL's selection, approval and retention process of tour operators requires, amongst other things, that it conduct an evaluation of the specific operator including, but not limited to, its operating history, policies and procedures and safety record, which should have revealed, amongst other things, that the operator of the flight portion of the Misty Fjords Tour was not safe; had a significant deficient safety record; did not equip its aircraft with technology (collision-avoidance equipment) specifically designed to, amongst other things, prevent mid-air collisions;

did not require that the available collision-avoidance technology was operational prior to flight;  and/or failed to provide appropriate training regarding such equipment, if available, notwithstanding that it knew, or should have known, that the flight portion of the tour was conducted in heavily congested visual flight rules airspace; that the operator did not provide the highest level of safety for Defendant PCL's passengers; and/or did not have sufficient liability insurance to cover potential losses incurred by the Defendant PCL's passengers, specifically including the death of PLAINTIFFS' decedent;

b.     Defendant PCL was aware, or should have been aware, of the prior operating history and/or significant deficient safety record of the operator of the flight portion of the Misty Fjords Tour, and failed to ensure, as its materials attested, that the operator was safe;

c.     Defendant PCL, through prior experience knew, or should have known, that its implication that tour operators would be subject to the personal jurisdiction of courts in California was misleading in that it knew that tour operators regularly challenge the personal jurisdiction of courts located in California; and

d.     By vetting and approving Defendant TAQUAN AIR, Defendant PCL expressly and/or implied to PLAINTIFFS' decedent, that Defendant

TAQUAN AIR was a safe operator. Yet, by failing to disclose Defendant TAQUAN AIR as the operator to PLAINTIFFS' decedent before the flight, Defendant PCL prevented PLAINTIFFS' decedent from discovering through publicly available information, that Defendant TAQUAN AIR was in fact, a very unsafe operator with a significant accident history, and/or given the information known, or that should have been known to Defendant PCL, these representations were false, misleading and incorrect.

86.    At all times relevant, Defendant PCL's statements were made or disseminated with the intent or purpose, either directly or indirectly, of inducing its passengers, specifically including PLAINTIFFS' decedent, to rely upon the statements and purchase tickets for the Misty Fjords Tour from which Defendant PCL profited.

87.    At all times relevant herein, PLAINTIFFS' decedent justifiably, and specifically did, rely upon the representations made by Defendant PCL when she purchased her ticket for the Misty Fjords Tour, and such reliance was expected and justified in that Defendant PCL made all arrangements with respect to the Misty Fjords Tour; Defendant PCL was paid for the Misty Fjords Tour; Defendant PCL marketed the Misty Fjords Tour using its logo on all promotional materials; Defendant PCL specifically encouraged its passengers to purchase tickets on the Misty Fjords Tour through it, to the exclusion of other tour operators; Defendant

1  PCL never disclosed to PLAINTIFFS' decedent the name of the operator of the

2  flight portion of the tour; and exclusive contacts by PLAINTIFFS' decedent with

3  respect to the Misty Fjords Tour were by and through Defendant PCL.

4      88.    As a result, Defendant PCL had an obligation to accurately disclose

5  all information concerning the Misty Fjords Tour, including, but not limited to, the

6  entity that was to perform the flight portion of the Misty Fjords Tour, which

7  Defendant PCL failed to do.

8      89.    As a result of the foregoing misrepresentations, upon which

9  PLAINTIFFS' decedent specifically relied, PLAINTIFFS' decedent purchased

10  from Defendant PCL tickets for the Misty Fjords Tour during which the mid-air

11  collision took place. Absent Defendant PCL's material misrepresentations,

12  PLAINTIFFS' decedent would not have purchased a ticket from Defendant PCL

13  for the Misty Fjords Tour, and as such, Defendant PCL is liable to PLAINTIFFS

14  for the loss, damage and/or injury claimed herein.

15      90.    As a result of the accident, PLAINTIFFS' decedent lost her life by

16  drowning and, prior thereto, experienced pre-death terror, emotional distress, pain,

17  and suffering. As a result, PLAINTIFFS have sustained loss, damage and/or injury,

18  including a loss of services, assistance, protection, affection, love, instruction,

19  guidance, counsel, training, support, care, comfort, and society.

20

**THIRD CAUSE OF ACTION FOR NEGLIGENT SELECTION**

**AND/OR RETENTION AGAINST DEFENDANT PCL**

91.     PLAINTIFFS repeat, reiterate and re-allege all allegations contained in paragraphs 1 through 90 as though fully set forth at length herein.

92.     At all material times, Defendant PCL, as a common carrier, and/or as acting on behalf of a common carrier, owed a duty to their fare-paying passengers, including PLAINTIFFS' decedent, to provide the utmost and highest duty of care for the health, welfare, and safety of their passengers, for the subject scenic flight excursion.

93.     At all times relevant, it was the duty of Defendant PCL to provide PLAINTIFFS' decedent with reasonable care under the circumstances.

94.     At all times relevant, Defendant PCL had a duty and obligation to select, hire, and/or retain a competent, safe and fit operator to provide the flight portion of the Misty Fjords Tour, and as such, Defendant PCL was required to diligently inquire, and continue to inquire, into the operator's operating history, safety record, and all aspects of flight operations, specifically with respect to the subject model aircraft that it selected for the flight portion of the Misty Fjords Tour.

95.     Defendant PCL breached the duty of care owed to PLAINTIFFS' decedent by selecting, hiring and/or retaining an incompetent, inappropriate, unsafe

1   and/or unfit operator for the flight portion of the Misty Fjords Tour based on,

2   including, but not limited to, the following:

3          a.     the failure of Defendant PCL to properly and/or appropriately

4   ensure that the flight operator could provide the highest level of safety to

5   Defendant PCL's passengers who participated in the Misty Fjords Tour,

6   given the flight operator's prior operating history and/or significant deficient

7   safety record;

8          b.     the failure of Defendant PCL to select a flight operator that

9   provided reasonable and appropriate training of the pilot who piloted the

10  Taquan Otter Aircraft at the time of the mid-air collision;

11         c.     the failure of Defendant PCL to select a flight operator who

12  implemented all appropriate policies and procedures to avoid a mid-air

13  collision;

14         d.     the failure of Defendant PCL to properly and/or appropriately

15  examine the flight operator's safety record and prior operating history;

16         e.     the failure of Defendant PCL to select a flight operator who

17  would and could provide a safe flight;

18         f.     the failure of the Defendant PCL to continually oversee and

19  monitor the operator who provided the flight portion of the Misty Fjords

20

Tour to ensure that it was providing the highest level of safety to Defendant PCL's passengers, specifically including PLAINTIFFS' decedent;

      g.    the failure of the Defendant PCL in selecting a flight tour operator that did not utilize the services of a dedicated tour guide and/or lookout which forced the pilot of the Taquan Otter Aircraft to simultaneously act as the pilot in command and tour guide thereby preventing him from focusing exclusively on his operational duties, especially since Defendant PCL knew, or should have known, that the flight portion of the tour was conducted in heavily congested visual flight rules airspace; and

      h.    the failure of the Defendant PCL to ensure and/or require that the aircraft utilized for the flight portion of the Misty Fjords Tour was equipped with technology (collision avoidance equipment) which was specifically designed to, amongst other things, prevent mid-air collisions, and/or ensure that if such equipment was available, it was operational and the pilot conducting the tour paid special attention to such equipment, especially since Defendant PCL knew, or should have known, that the flight portion of the Misty Fjords Tour was conducted in heavily congested visual flight rules airspace.

96.    Defendant TAQUAN AIR should not have been hired, retained, and or used by Defendant PCL to operate the flight. Had Defendant PCL not used

1   Defendant TAQUAN AIR to operate the subject flight, the accident would not have

2   occurred.

3       97.     As a result of the foregoing, Defendant PCL proximately caused

4   PLAINTIFFS' decedent to be on the accident flight. As a result of the accident,

5   PLAINTIFFS' decedent lost her life by drowning and, prior thereto, experienced

6   pre-death terror, emotional distress, pain, and suffering. As a result, PLAINTIFFS

7   have sustained loss, damage and/or injury, including a loss of services, assistance,

8   protection, affection, love, instruction, guidance, counsel, training, support, care,

9   comfort, and society.

10      **FOURTH CAUSE OF ACTION FOR NEGLIGENT**

11      **FAILURE TO WARN/DISCLOSE AGAINST DEFENDANT PCL**

12      98.     PLAINTIFFS repeat, reiterate and re-allege all allegations contained

13   in paragraphs 1 through 97 as though fully set forth at length herein.

14      99.     At all material times, Defendant PCL, as a common carrier, owed a

15   duty to their fare-paying passengers, including PLAINTIFFS' decedent, the utmost

16   and highest duty of care for the health, welfare, and safety of their passengers, for

17   the subject scenic flight excursion.

18      100.    At all times relevant, it was the duty of Defendant PCL to provide

19   PLAINTIFFS' decedent with reasonable care under the circumstances.

20

101. At all times relevant, Defendant PCL was the "charterer" of the subject aircraft that it used for the flight portion of the Misty Fjords Tour, and/or acted as an "air charter broker" and/or an "indirect air carrier" as these terms are defined under the Federal Aviation Regulations.

102. As a result, Defendant PCL was required to disclose, warn and/or advise PLAINTIFFS' decedent of certain information regarding the operator of the flight portion of the Misty Fjords Tour, pursuant to the Federal Aviation Regulations and/or otherwise.

103. Defendant PCL failed to disclose certain information which it was required to disclose, and/or should have disclosed, including, but not limited to the following:

    a. Defendant PCL failed to disclose the name of the operator of the flight portion of the Misty Fjords Tour as was required by applicable Federal Aviation Regulations and/or otherwise, thereby depriving PLAINTIFFS' decedent the opportunity to conduct an examination into said operator, and/or deprived PLAINTIFFS' decedent from making an informed decision as to whether she would choose to put her life in the hands of the operator chosen by Defendant PCL;

    b. Defendant PCL failed to disclose to PLAINTIFFS' decedent that the Taquan Otter Aircraft that it selected for the flight portion of the Misty

Fjords Tour was not equipped with, and/or properly using, technology (collision avoidance equipment) which was specifically designed to, amongst other things, prevent mid-air collisions, and/or ensure that if such equipment was available, it was operational and the pilot conducting the tour paid special attention to such equipment, and said information should have been disclosed especially since Defendant PCL knew, or should have known, that the flight portion of the Misty Fjords Tour was conducted in heavily congested visual flight rules airspace thereby depriving PLAINTIFFS' decedent the opportunity to make an informed decision as to whether she would choose to put her life in the hands of the operator chosen by Defendant PCL;

c.     Defendant PCL failed to disclose that the operator of the flight portion of the Misty Fjords Tour had a significant deficient safety record, and such information should have been disclosed especially since Defendant PCL knew, or should have known, that the flight portion of the Misty Fjords Tour was conducted in heavily congested visual flight rules airspace thereby depriving PLAINTIFFS' decedent the opportunity to make an informed decision as to whether she would choose to put her life in the hands of the operator chosen by Defendant PCL; and

d.    Defendant PCL failed to warn PLAINTIFFS' decedent of the incompetence and unfitness of TAQUAN, and the increased risk of danger and accidents in flying with Defendant TAQUAN AIR. Defendant PCL failed to warn PLAINTIFFS' decedent of the significant aircraft accident history of Defendant TAQUAN AIR, which had a culture of taking unreasonable flight risks on scenic flights for financial incentive. Had Defendant PCL fully disclosed these facts to PLAINTIFFS' decedent, and properly warned PLAINTIFFS' decedent of the dangers and risks in flying with Defendant TAQUAN AIR, PLAINTIFFS' decedent would not have purchased the subject excursion or taken the accident flight.

e.    Defendant PCL failed to disclose to PLAINTIFFS' decedent that TAQUAN had only recently begun to operate the subject model DHC-3 Otter aircraft, and such information should have been disclosed especially since Defendant PCL knew, or should have known, that the flight portion of the Misty Fjords Tour was conducted in heavily congested visual flight rules airspace thereby depriving PLAINTIFFS' decedent the opportunity to make an informed decision as to whether she would choose to put her life in the hands of Defendant TAQUAN AIR, who had recently purchased and merged Promech into Defendant TAQUAN AIR, including Promech's aircraft, flight

operations, and pilots, of which had a history and culture of unsafe practices; and

    f.    Defendant PCL failed to disclose other information which should have been disclosed thereby denying PLAINTIFFS' decedent the opportunity to make an informed decision as to whether she would choose to put her life in the hands of the operator chosen by Defendant PCL.

104.  Had Defendant PCL disclosed information that was required to have been disclosed, and/or information that should have been disclosed, and/or provided appropriate warnings, all as set forth herein, PLAINTIFFS' decedent, upon being made aware of such information, would not have purchased her ticket for the Misty Fjords Tour from the Defendant PCL, and thus, would not have been killed in the incident. As such, Defendant PCL's failure to disclose such information and/or provide appropriate warnings renders Defendant PCL liable to PLAINTIFFS for the loss, damage and/or injury as alleged herein.

105.  Had Defendant PCL provided complete and adequate disclosures and warnings, PLAINTIFFS' decedent would not have taken the accident flight. As a result of the accident, PLAINTIFFS' decedent lost her life by drowning and, prior thereto, experienced pre-death terror, emotional distress, pain, and suffering. As a result, PLAINTIFFS have sustained loss, damage and/or injury, including a loss of

1   services, assistance, protection, affection, love, instruction, guidance, counsel,

2   training, support, care, comfort, and society.

3   **FIFTH CAUSE OF ACTION FOR VICARIOUS**

4   **LIABILITY-ACTUAL AGENCY AGAINST DEFENDANT PCL**

5   106.   PLAINTIFFS repeat, reiterate and re-allege all allegations contained

6   in paragraphs 1 through 105 as though fully set forth at length herein.

7   107.   At all times relevant, it was the duty of Defendant PCL to provide

8   PLAINTIFFS' decedent with reasonable care under the circumstances.

9   108.   At all times relevant, Defendant TAQUAN AIR acted on behalf of

10   Defendant PCL with respect to the flight portion of the Misty Fjords Tour sold by

11   Defendant PCL.

12   109.   Upon information and belief, Defendant PCL entered into the Tour

13   Operating Contract with Defendant TAQUAN AIR, whereby Defendant PCL,

14   amongst other things, acted as said defendant's principal performing all billing,

15   advertising, promotion, ticket sales, coordination, etc., with respect to the Misty

16   Fjords Tour, and provided Defendant TAQUAN AIR with all passengers, including

17   PLAINTIFFS' decedent, as well as compensation for flight services rendered to

18   Defendant PCL's passengers, including PLAINTIFFS' decedent, for the flight

19   portion of the Misty Fjords Tour.

20

110.   In addition, as detailed herein, evidence of the actual agency between the Defendants PCL and TAQUAN AIR includes, but is not limited to: Defendant PCL marketed, promoted, advertised and sold the Misty Fjords Tour on behalf of Defendant TAQUAN AIR; Defendant PCL answered all questions and provided all information concerning the tour; all of Defendant PCL's promotional materials identified the tour as a "PCL tour" and prominently featured and displayed PCL's logo; the sole and exclusive contact by PLAINTIFFS' decedent with respect to the Misty Fjords Tour was with the Defendant PCL; PLAINTIFFS' decedent was solicited by Defendant PCL to only purchase tours through it; PLAINTIFFS' decedent paid Defendant PCL for the tour; PLAINTIFFS' decedent received a receipt for her purchase from Defendant PCL; PLAINTIFFS' decedent was never advised the name of the operator of the flight portion of the tour; PLAINTIFFS' decedent was directed from the *Royal Princess* to the boat portion of the tour by Defendant PCL's agents, servants, employees and/or representatives; and PLAINTIFFS' decedent was at all times led to believe that Defendant PCL managed, operated, controlled, owned and/or co-owned the Misty Fjords Tour.

111.   Based upon the foregoing, Defendant TAQUAN AIR is the actual agent of Defendant PCL and as such, Defendant PCL is liable, vicariously, directly or otherwise for the actions and/or omissions of Defendant TAQUAN AIR as detailed herein.

112.   The mid-air collision, crash and PLAINTIFFS' injuries were caused, in whole or in part, by the negligence, recklessness, and/or carelessness of Defendant TAQUAN AIR for which Defendant PCL is responsible as alleged herein.

113.   As a result of the accident, PLAINTIFFS' decedent lost her life by drowning and, prior thereto, experienced pre-death terror, emotional distress, pain, and suffering. As a result, PLAINTIFFS have sustained loss, damage and/or injury, including a loss of services, assistance, protection, affection, love, instruction, guidance, counsel, training, support, care, comfort, and society.

**SIXTH CAUSE OF ACTION FOR APPARENT AGENCY OR**

**AGENCY BY ESTOPPEL AGAINST DEFENDANT PCL**

114.   PLAINTIFFS repeat, reiterate and re-allege all allegations contained in paragraphs 1 through 113 as though fully set forth at length herein.

115.   At all times relevant, it was the duty of Defendant PCL to provide PLAINTIFFS' decedent with reasonable care under the circumstances.

116.   At all times relevant, Defendant TAQUAN AIR was the apparent agent of the Defendant PCL with respect to the flight portion of the tour sold by Defendant PCL.

///

///

117.   At all times relevant, Defendant PCL is estopped to deny that Defendant TAQUAN AIR was its agent and/or apparent agent with respect to the flight portion of the tour sold by Defendant PCL.

118.   As detailed herein, Defendant PCL made various representations which caused PLAINTIFFS' decedent to reasonably and justifiably believe that the operator of the flight portion of the Misty Fjords Tour was Defendant PCL's agent including, but not limited to, Defendant PCL marketed, promoted, advertised and sold the Misty Fjords Tour on behalf of the Defendant TAQUAN AIR; Defendant PCL answered all questions and provided all information concerning the tour; all of Defendant PCL's promotional materials identified the tour as a "PCL tour" and prominently featured and displayed PCL's logo; the only contact PLAINTIFF' decedent had with respect to the Misty Fjords Tour was with Defendant PCL; PLAINTIFFS' decedent was solicited by Defendant PCL to only purchase tours through it; PLAINTIFFS' decedent paid Defendant PCL for the tour; PLAINTIFFS' decedent received a receipt for her purchase from Defendant PCL; PLAINTIFFS' decedent was never advised the name of the operator of the flight portion of the tour; PLAINTIFFS' decedent was directed from the *Royal Princess* to the boat portion of the tour by Defendant PCL's agents, servants, employees and/or representatives; and PLAINTIFFS' decedent was at all times led to believe

that Defendant PCL managed, operated, controlled, owned and/or co-owned the Misty Fjords Tour.

119.   As a result, PLAINTIFFS' decedent reasonably and justifiably relied on the foregoing, to her detriment, and reasonably and justifiably believed that the operator of the flight portion of the Misty Fjords Tour was the representative and/or agent of Defendant PCL.

120.   PLAINTIFFS' decedent's reasonable and justifiable reliance was detrimental to her because without such belief that the operator of the flight portion of the tour was the agent and/or representative of the Defendant PCL, PLAINTIFFS' decedent would not have purchased, booked or participated in the Misty Fjords Tour that was sold by the Defendant PCL, and thus, would not have lost her life.

121.   The mid-air collision, crash and death of PLAINTIFFS' decedent were caused, in whole or in part, by the negligence, recklessness, and/or carelessness of Defendant TAQUAN AIR, for which Defendant PCL is responsible as alleged herein.

122.   As a result of the accident, PLAINTIFFS' decedent lost her life by drowning and, prior thereto, experienced pre-death terror, emotional distress, pain, and suffering. As a result, PLAINTIFFS have sustained loss, damage and/or injury,

1  including a loss of services, assistance, protection, affection, love, instruction,

2  guidance, counsel, training, support, care, comfort, and society.

3  **SEVENTH CAUSE OF ACTION AGAINST DEFENDANT PCL**

4  **BASED ON JOINT VENTURE WITH DEFENDANT TAQUAN AIR**

5  123.   PLAINTIFFS repeat, reiterate and re-allege all allegations contained

6  in paragraphs 1 through 122  as though fully set forth at length herein.

7  124.   At all times relevant, Defendant PCL engaged in a joint venture and/or

8  common enterprise with Defendant TAQUAN AIR to market, promote, sell and/or

9  operate the Misty Fjords Tour.

10  125.   As for its part with respect to the joint venture, amongst other things,

11  Defendant PCL arranged, marketed, recommended, promoted, advertised, sold,

12  and/or collected payment for the tour, which monies, then, upon information and

13  belief, was shared between Defendants PCL and TAQUAN AIR.

14  126.   At all times relevant, Defendants PCL and TAQUAN AIR shared a

15  common purpose, namely, to operate the Misty Fjords Tour for a profit.

16  127.   At all times relevant, Defendants PCL and TAQUAN AIR had joint

17  proprietary and/or pecuniary interests in the Misty Fjords Tour.  Defendant PCL's

18  interest included sponsoring, recommending, advertising, marketing, and selling

19  the Misty Fjords Tour, and Defendant TAQUAN AIR's interest included the time

20  and labor in conducting the flight portion of the tour.

1    128.   In addition, upon information and belief, Defendants PCL and

2    TAQUAN AIR shared in profits as well as losses generated from the marketing,

3    sale and operation of the Misty Fjords Tour.

4    129.   As a result of engaging in a joint venture and/or common enterprise,

5    these defendants are jointly and severally liable for each other's negligence,

6    recklessness, and/or carelessness as partners and/or collective participants in the

7    joint venture and/or common enterprise.

8    130.   At all times relevant, Defendants PCL and TAQUAN AIR had an

9    intention to create a joint venture and/or common enterprise for profit; each had a

10   proprietary and/or pecuniary interest in the subject matter of the joint venture

11   and/or common enterprise; and had a right to share in the profits earned, and losses

12   incurred, from the joint venture and/or common enterprise, namely, the Misty

13   Fjords Tour.

14   131.   As a result of being a participant in a joint venture and/or common

15   enterprise, Defendant PCL is responsible and liable for the negligence,

16   recklessness, and/or carelessness of the Defendant TAQUAN AIR.

17   132.   The mid-air collision, crash and the death of PLAINTIFFS' decedent

18   were caused, in whole or in part, by the negligence, recklessness, and/or

19   carelessness of Defendant TAQUAN AIR, for which the Defendant PCL is

20   responsible as alleged herein.

133.   As a result of the accident, PLAINTIFFS' decedent lost her life by drowning and, prior thereto, experienced pre-death terror, emotional distress, pain, and suffering. As a result, PLAINTIFFS have sustained loss, damage and/or injury, including a loss of services, assistance, protection, affection, love, instruction, guidance, counsel, training, support, care, comfort, and society.

**EIGHTH CAUSE OF ACTION AGAINST DEFENDANT PCL**

**BASED UPON BREACH OF CONTRACT AND**

**THIRD-PARTY BENEFICIARY**

134.   PLAINTIFFS repeat, reiterate and re-allege all allegations contained in paragraphs 1 through 133 as though fully set forth at length herein.

135.   Upon information and belief, Defendants PCL and TAQUAN AIR entered into the Tour Operating Contract to provide the flight portion of the Misty Fjords Tour, for the benefit of each other, as well as for the benefit of Defendant PCL's passengers, specifically including PLAINTIFFS' decedent.

136.   The intent of the Tour Operating Contract to benefit Defendant PCL's passengers, specifically including PLAINTIFFS' decedent, was expressed by the provisions of the contract.  Upon information and belief, the contractual provisions evidenced that the purpose of the contract was for Defendant TAQUAN AIR to provide flight services for the Misty Fjords Tour to Defendant PCL's passengers; allowed the Defendant PCL to charge its cruise passengers, including

PLAINTIFFS' decedent, the price that it deemed appropriate for the tour; Defendant PCL compensated Defendant TAQUAN AIR for flight services rendered to Defendant PCL's passengers, including PLAINTIFFS' decedent; Defendant PCL had the sole discretion to issue refunds; Defendant PCL required that Defendant TAQUAN AIR use the highest standard of care for the passengers' safety; and/or Defendant PCL required that Defendant TAQUAN AIR maintain certain liability coverage for the benefit of passengers, specifically including PLAINTIFFS' decedent.

137.   As demonstrated herein, Defendant PCL breached said contract, to the detriment of PLAINTIFFS' decedent by, amongst other things, representing and promoting that the Misty Fjords Tour was safe when in fact it was not; by Defendant PCL's representations that the safety of its passengers were paramount despite the fact that it selected an operator to conduct the flight portion of the Misty Fjords Tour who had a deficient safety record, and whose aircraft was not equipped with specific technology (collision avoidance equipment) designed to, amongst other things, prevent mid-air collisions, and/or ensure that if such equipment was available, it was operational and the pilot conducting the tour paid special attention to such equipment notwithstanding that Defendant PCL knew, or should have known, that the flight portion of the Misty Fjords Tour was conducted in highly congested visual flight rules airspace; failed to provide a safe tour; failed to

adequately ensure the safety of PLAINTIFFS' decedent; failed to adequately disclose, warn or advise PLAINTIFFS' decedent of the operator who was to conduct the flight portion of the tour; failed to adequately select and/or retain the tour operator notwithstanding that the subject tour was promoted, advertised, and sold as having been selected by Defendant PCL as being a safe and unique experience; failed to adequately and/or appropriately promote the highest safety standards in the industry; failed to properly vet, select, and/or audit the tour operator; failed to warn that the tour operator may contest the jurisdiction of the courts of this state, notwithstanding that Defendant PCL requires PLAINTIFFS to file suit in this court for death and/or injury sustained during the tour; failed to disclose that the tour operator maintains far less insurance coverage than the Defendant PCL; failed to review the tour operator's safety record and/or prior operating history; and otherwise breached the contract which was intended to benefit PLAINTIFFS' decedent, all to her detriment and damages.

138.  The aforementioned contract was specifically intended to benefit PLAINTIFFS' decedent, and the mid-air collision, crash and death of PLAINTIFFS' decedent were caused, in whole or in part, by the aforementioned contractual breaches by Defendant PCL and as a result, Defendant PCL is liable to PLAINTIFFS for their damages as set forth below.

139.   As a result of the accident, PLAINTIFFS' decedent lost her life by drowning and, prior thereto, experienced pre-death terror, emotional distress, pain, and suffering. As a result, PLAINTIFFS have sustained loss, damage and/or injury, including a loss of services, assistance, protection, affection, love, instruction, guidance, counsel, training, support, care, comfort, and society.

**NINTH CAUSE OF ACTION FOR**

**NEGLIGENCE AGAINST DEFENDANT TAQUAN AIR**

140.   PLAINTIFFS repeat, reiterate and re-allege all allegations contained in paragraphs 1 through 139 as though fully set forth at length herein.

141.   At all material times, Defendant TAQUAN AIR, as a common carrier, owed a duty to their paying passengers, including PLAINTIFFS' decedent, to provide the utmost and highest duty of care for the health, welfare, and safety of their passengers, for the subject scenic flight excursion.

142.   At all times relevant, it was the duty of Defendant TAQUAN AIR to provide PLAINTIFFS' decedent with reasonable care under the circumstances.

143.   At all times relevant the pilot of the Taquan Otter Aircraft (Mr. Lewis Beck) was an agent, servant, employee and/or representative of Defendant TAQUAN AIR and was acting within the course and scope of his employment at the time of the mid-air collision which is the subject of this litigation and as such,

Defendant TAQUAN AIR is liable for all actions and/or omissions of its pilot, in causing and/or contributing to the accident.

144.   The mid-air collision, crash, injuries and death of PLAINTIFFS' decedent, individually and/or collectively, were caused by Defendant TAQUAN AIR's negligence, recklessness and/or carelessness in one or more of the following ways:

a.   in that the pilot failed to see and avoid the Mountain Air Beaver Aircraft;

b.   in that the pilot failed to keep a proper lookout and/or observe other aircraft in and around the airspace above the George Inlet, including, the Mountain Air Beaver Aircraft;

c.   in that the pilot failed to avoid and improperly collided mid-air with the Mountain Air Beaver Aircraft;

d.   in that the pilot failed to properly and appropriately operate the Taquan Otter Aircraft in the applicable airspace and pursuant to proper procedures;

e.   in that the pilot violated Federal Aviation Regulations, including but not limited to failure to comply with aircraft right-of-way (14 CFR 91.113), failure to see and avoid (14 CFR 91.113(b)), failure to maintain

aircraft spacing (14 CFR 91.111), and operating in a careless and/or reckless manner (14 CFR 91.13)  which proximately caused the mid-air collision;

f.     in that the pilot failed to properly operate and control the Taquan Otter Aircraft;

g.     in that the pilot failed to take steps necessary to avoid the mid-air collision;

h.     in that the pilot failed to utilize and/or abide by the air traffic avoidance equipment installed on the Taquan Otter Aircraft, including ADS-B equipment;

i.     in that the pilot failed to monitor aircraft communications to ascertain any potential conflicting traffic;

j.     in that the pilot flew a non-standard route of flight which proximately caused the mid-air collision;

k.     in that Defendant TAQUAN AIR, by and through its policies and procedures, fostered a working and operating environment which resulted in profits over safety, including, but not limited to, the requirement that the pilot of the Taquan Otter Aircraft simultaneously act as the pilot-in-command and as a tour guide notwithstanding that Defendant TAQUAN AIR knew, or should have known, that the flight was conducted in extremely congested airspace, and requiring the pilot to act in this dual capacity distracted him

from performing his operational duties as a pilot, and resulted, in whole or in part, in the mid-air collision;

l.   in that Defendant TAQUAN AIR failed to provide a dedicated tour guide to conduct the tour which would have allowed the pilot of the Taquan Otter Aircraft to focus exclusively on his operational duties especially in a heavily congested visual flight rules operating environment which would have prevented the mid-air collision;

m.   in that Defendant TAQUAN AIR failed to provide a dedicated lookout on board the Taquan Otter Aircraft to assist its pilot especially since it knew, or should have known, that the Taquan Otter Aircraft operated in a heavily congested visual flight rules environment and had such a lookout been required and present, the mid-air collision would not have occurred;

n.   in that Defendant TAQUAN AIR failed to implement appropriate policies and procedures that would have prevented the mid-air collision, including, but not limited to, appropriate training;

o.   in that Defendant TAQUAN AIR failed to implement appropriate safety recommendations in order to prevent mid-air collisions by its sight-seeing aircraft, including, but not limited to, equipping its aircraft with the most-updated technology (collision-avoidance equipment), which is designed, in part, to specifically prevent mid-air collisions, and/or requiring

that said equipment is operational prior to flight and that specific training

mandate that the pilot adhere to such equipment, if available;

p.    in that Defendant TAQUAN AIR failed to provide its passengers

with the highest level of safety, including, but not limited to, by failing to

conduct a safe flight all as alleged herein; failing to equip its aircraft with the

most-updated technology (collision avoidance equipment), which was

designed, in part, to specifically prevent mid-air collisions, and/or failed to

require that said equipment was operational prior to flight and failed to stress

to its pilots the importance of adhering to such equipment, if available; all of

which is especially egregious since Defendant TAQUAN AIR knew, or

should have known, that the Taquan Otter Aircraft operated in highly

congested visual flight rules airspace;

q.    in that Defendant TAQUAN AIR allowed its pilot to fly a non-

standard route of flight which increased the likelihood of a mid-air collision,

notwithstanding that Defendant TAQUAN AIR knew, or should have

known, that the Taquan Otter Aircraft operated in a heavily congested visual

flight rules environment and such a flight pattern could and did lead to the

mid-air collision;

r.    in that Defendant TAQUAN AIR failed to properly train its pilots

with effective see and avoid techniques and procedures, especially since it

knew, and/or should have known, that its aircraft operated in a heavily congested visual flight rules environment;

s.    in that Defendant TAQUAN AIR failed to implement appropriate policies, procedures and/or guidelines to eliminate the possibility of a collision with other aircraft despite the fact that it knew, or should have known, that the possibility of a mid-air collision needed to be eliminated especially since the Taquan Otter Aircraft operated in a heavily congested visual flight rules environment; and

t.    Defendant TAQUAN AIR, and/or its agents, servants, employees and/or representatives, were negligent by, amongst other things, utilizing an outdated, un-certified aircraft checklist which was used by the prior owner/operator of the Turbine Otter Aircraft N959PA, namely Promech, which checklist, among other things, failed to incorporate checklist items for the traffic collision-avoidance equipment (ADS-B), which was required to be used during the flight.

u.    Defendant TAQUAN AIR, and/or its agents, servants, employees and/or representatives, were otherwise negligent, reckless and/or careless; all of which resulted, in whole or in part, in the mid-air collision that caused the death of PLAINTIFFS' decedent.

145.   As a result of the accident, PLAINTIFFS' decedent lost her life by drowning and, prior thereto, experienced pre-death terror, emotional distress, pain, and suffering. As a result, PLAINTIFFS have sustained loss, damage and/or injury, including a loss of services, assistance, protection, affection, love, instruction, guidance, counsel, training, support, care, comfort, and society.

**TENTH CAUSE OF ACTION FOR**

**NEGLIGENCE AGAINST DEFENDANT MOUNTAIN AIR**

146.   PLAINTIFFS repeat, reiterate and re-allege all allegations contained in paragraphs 1 through 145 as though fully set forth at length herein.

147.   At all times relevant the pilot of the Mountain Air Beaver Aircraft (Mr. Randy Sullivan) was an agent, servant, employee and/or representative of Defendant MOUNTAIN AIR, and was acting within the course and scope of his employment at the time of the mid-air collision which is the subject of this litigation and as such, Defendant MOUNTAIN AIR is liable for all actions and/or omissions of its pilot.

148.   The mid-air collision, crash,  and the injuries and death of PLAINTIFFS' decedent, individually and/or collectively, were caused by Defendant MOUNTAIN AIR's negligence, recklessness and/or carelessness in one or more of the following ways:

a.    in that the pilot failed to see and avoid the subject Taquan Otter Aircraft;

b.    in that the pilot failed to keep a proper lookout and/or observe other aircraft in and around the airspace above the George Inlet, including, the Taquan Otter Aircraft;

c.    in that the pilot improperly collided mid-air with the Taquan Otter Aircraft;

d.    in that the pilot failed to properly and appropriately operate the Mountain Air Beaver Aircraft in the applicable airspace;

e.    in that the pilot violated Federal Aviation Regulations, including but not limited to, failure to comply with aircraft right-of-way (14 CFR 91.113), failure to see and avoid (14 CFR 91.113(b)), failure to maintain aircraft spacing (14 CFR 91.111), failure to fly proper cruising altitude (14 CFR 91.159), and operating in a careless and/or reckless manner (14 CFR 91.13). which proximately caused the mid-air collision;

f.    in that the pilot failed to properly operate and control the Mountain Air Beaver Aircraft;

g.    in that the pilot failed to take steps necessary to avoid the mid-air collision;

h.    in that the pilot failed to utilize and/or abide by the air traffic avoidance equipment installed on the Mountain Air Beaver Aircraft;

i.    in that the pilot failed to monitor aircraft communications to ascertain any potential conflicting traffic, failed to fly proper procedures for the area, and failed to make proper position reporting;

j.    in that the pilot flew a non-standard route of flight which proximately caused the mid-air collision;

k.    in that Defendant MOUNTAIN AIR failed to provide a dedicated tour guide to conduct the tour which would have allowed the pilot of the Mountain Air Beaver Aircraft to focus exclusively on his operational duties especially in a heavily congested visual flight rules operating environment which would have prevented the mid-air collision;

l.    in that Defendant MOUNTAIN AIR failed to provide a dedicated lookout on board the Mountain Air Beaver Aircraft to assist its pilot especially since it knew, or should have known, that the Mountain Air Beaver Aircraft operated in a heavily congested visual flight rules environment and had such a lookout been required and present, the mid-air collision would not have occurred;

///

///

m.   in that Defendant MOUNTAIN AIR failed to implement appropriate policies and procedures that would have prevented the mid-air collision including, but not limited to, appropriate training;

n.   in that Defendant MOUNTAIN AIR failed to implement appropriate safety recommendations in order to prevent mid-air collisions by its aircraft conducting flight seeing aircraft rides, including, but not limited to, equipping its aircraft with the most-updated technology (collision avoidance equipment), which was designed, in part, to specifically prevent mid-air collisions and/or requiring specific training mandating that the pilot adhere to such equipment, if available;

o.   in that Defendant MOUNTAIN AIR failed to provide the highest level of safety, including, but not limited to, by failing to equip its aircraft with the most-updated technology (collision avoidance equipment), which was designed, in part, to specifically prevent mid-air collisions, and/or failed to stress to its pilots the importance of adhering to such equipment if available, which is especially egregious since it knew, or should have known, that the Mountain Air Beaver Aircraft operated in highly congested visual flight rules airspace;

p.   in that Defendant MOUNTAIN AIR allowed its pilot to fly a non-standard route of flight which increased the likelihood of a mid-air collision,

notwithstanding the fact that it knew, or should have known, that the Mountain Air Beaver Aircraft operated in a heavily congested visual flight rules environment and such a flight pattern could and did lead to the mid-air collision;

q.    in that Defendant MOUNTAIN AIR failed to properly train its pilots with effective see and avoid techniques and procedures, especially since it knew, and/or should have known, that its aircraft operated in a heavily congested visual flight rules environment;

r.    in that Defendant MOUNTAIN AIR failed to implement appropriate policies, procedures and/or guidelines to eliminate the possibility of a collision with other aircraft despite the fact that it knew, or should have known, that the possibility of a mid-air collision needed to be eliminated especially since the Mountain Air Beaver Aircraft operated in a heavily congested visual flight rules environment; and

s.    Defendant MOUNTAIN AIR, and/or its agents, servants, employees and/or representatives, were otherwise negligent, reckless and/or careless; all of which resulted, in whole or in part, in the mid-air collision that caused injury to and the death of PLAINTIFFS' decedent.

149.  As a result of the accident, PLAINTIFFS' decedent lost her life by drowning and, prior thereto, experienced pre-death terror, emotional distress, pain,

and suffering. As a result, PLAINTIFFS have sustained loss, damage and/or injury, including a loss of services, assistance, protection, affection, love, instruction, guidance, counsel, training, support, care, comfort, and society.

### ALLEGATIONS APPLICABLE TO ALL CAUSES OF ACTION

150. PLAINTIFFS repeat, reiterate and re-allege all allegations contained in paragraphs 1 through 149 as though fully set forth at length herein.

151. Defendants are each, jointly and severally liable to PLAINTIFFS, based upon applicable law, including under general maritime law, and/or California law, and/or Alaska law and/or Missouri law.

152. As a result of the foregoing and the mid-air collision PLAINTIFFS suffered the loss, damage and/or injury alleged herein.

153. At the time of her untimely death, PLAINTIFFS' decedent was employed as an office manager with an insurance agency and a honing supply company, earning approximately $40,000 per year. She was 62 years of age (DOB 10/28/56) and planned to work until at least age 70.

154. PLAINTIFFS are informed and believe and based thereupon allege that PLAINTIFFS' decedent suffered severe but survivable injuries in the mid-air collision and impact with the water, only to drown while struggling to free herself from her seat restraints. Her death by drowning was slow and terrifying, punctuated by PLAINTIFFS' decedent trying to free herself from her restraints.

PLAINTIFFS' decedent drowned in waters that were measured by a NOAA weather station in the area to be 48.7° F. The findings from the autopsy are entirely consistent with death by drowning. Salt water drowning typically produces a good deal of frothy exudate from the mouth of the victim. In order for this to be produced and for the lungs to be swollen with fluid, as PLAINTIFF's decedent were at autopsy, there has to have been intact blood circulation and respiratory effort followed by aspiration of water.

155.   PLAINTIFFS' decedent is survived by her two sons:  PLAINTIFF Caleb, age 30 (DOB 1/19/90), and PLAINTIFF Dustin, age 28 (DOB 11/10/91). Both sons enjoyed a very close relationship with their mother. They were each frequently in contact with her, if not personally visiting, then speaking with her by phone on a weekly basis. Notwithstanding their age, these two young men continued to be very dependent upon their mother for advice and guidance. This underscores the closeness of their bond. PLAINTIFFS' decedent was the only parent Caleb and Dustin had known throughout their lifetime, as their father and mother divorced when they were very young. Their father has not ever been a participant in their lives, and that continues to the present day, leaving said surviving PLAINTIFFS to deal with this loss alone.

156.   The tragic loss of PLAINTIFFS' decedent has been a catastrophic blow to each of these young men, who have been left without the love and

guidance of their touchstone, the only parent they will ever know. Where once

they could count on always enjoying the simple pleasure of hearing their mother's

voice each week, they will no longer know the joy and security of her company.

The advice, encouragement, discipline and unwavering love they could always

rely upon from their mother, has now forever been ripped away from them.

157.   What is even more devastating is that they each have lost their

mother without ever having the chance to see her one last time, to hold her and to

tell her how much she truly meant to each of them. The boys do have each other;

however, they are having a profoundly difficult time navigating through life's

obstacles, now for the first time without the loving counsel of their mother.

158.   The Estate is entitled to assert a claim for the pre-death pain and

suffering of PLAINTIFF's decedent, from the horror she experienced just before

and during the mid-air collision, through the panic and helplessness she felt as a

survivor during the catastrophic descent, to her impact with the water and, finally,

during her struggle to survive as she submerged into the cold waters of George

Bay, only to drown in agony. Through the Estate, the two surviving sons of

PLAINTIFFS' decedent each assert a claim for loss of support, care, comfort and

society.

159.   Based upon the foregoing, PLAINTIFFS claim all damages against

the Defendants to which they are entitled according to proof at trial, including, but

not limited to, compensatory, economic, non-economic, attorney fees and punitive damages, including in that the conduct by said Defendants, their officers, agents, servants, employees and/or representatives, was outrageous, grossly negligent, and said Defendants acted with a reckless, willful, and knowing disregard of the rights and safety of others, specifically including PLAINTIFFS' decedent, and said Defendants placed profits over safety, such that said Defendants are liable for all damages, including punitive damages and attorney fees. Said damages, individually and/or collectively, are in excess of the jurisdictional limits of this Court.

**PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFFS, and each of them, pray for judgment against Defendants, and each of them, as follows:

1.  For pecuniary and non-pecuniary damages under General Maritime Law of the United States and/or under California Law and/or under the law of Missouri;

2.  For pre-death terror, emotional distress, pain, and suffering of PLAINTIFFS' decedent;

3.  For lost earnings and loss of the enjoyment of life;

4.  For other economic and non-economic damages;

5.  For loss of support, love, care, companionship, affection, instruction, guidance, counsel, training, comfort, society, value of services, and all recoverable damages arising due to the death of PLAINTIFFS' decedent;

6.  For funeral/interment/transportation expenses;

7.  For costs of suit incurred herein;

8.  For punitive/exemplary damages against Defendants PCL, TAQUAN AIR and MOUNTAIN AIR;

9.  For attorney fees, costs, and expenses, as allowed under applicable law;

10. For prejudgment interest as allowed by law; and

11. For such other and further relief as the Court may deem proper.

DATED: November 10, 2020          BAUM HEDLUND ARISTEI & GOLDMAN, P.C.

                                                    /s/ Clay S. Robbins
                                    By:   _____
                                          RONALD L.M. GOLDMAN
                                          CLAY ROBBINS, III

                                          *Attorneys for Plaintiffs CYNTHIA A. COLER, as Personal Representative and Administrator of the Estate of Cassandra J. Webb, and on behalf of CALEB J. WEBB and DUSTIN M. WEBB, the sole surviving heirs of Decedent, Cassandra J. Webb*

///

///

1

## JURY TRIAL DEMAND

2          Plaintiffs hereby request and demand a trial by jury on all claims so triable.

3    DATED:  November 10, 2020          BAUM HEDLUND ARISTEI & GOLDMAN, P.C.

4

/s/ Clay Robbins III

5                                   By: _____

6                                        RONALD L.M. GOLDMAN
                                         CLAY ROBBINS, III

7                                        *Attorneys for Plaintiffs CYNTHIA A.*
                                         *COLER, as Personal Representative and*
8                                        *Administrator of the Estate of Cassandra J.*
                                         *Webb, and on behalf of CALEB J. WEBB*
9                                        *and DUSTIN M. WEBB the sole surviving*
                                         *heirs of Decedent, Cassandra J. Webb*

10

11

12

13

14

15

16

17

18

19

20